IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:21-CR-156-KAC-DCP |
| ORAINE LIVINGSTON CHRISTIE, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or recommendation as may be appropriate. This case is before the Court on Defendant Oraine Livingston Christie's motion to suppress evidence seized or otherwise obtained during a stop of a vehicle Defendant was driving on December 1, 2021 [Doc. 68]. The Government filed its response in opposition to the motion to suppress [Doc. 69], and Defendant filed his reply [Doc. 70]. On March 2, 2023, the Court held a hearing on Defendant's motion. Assistant United States Attorneys ("AUSA") Anne-Marie Svolto and Brian Samuelson appeared on behalf of the Government. Attorney Laura Davis represented Defendant Christie, who was also present. At the conclusion of the hearing, the Court took the matter under advisement.

After reviewing the parties' briefs and arguments, the evidence and exhibits presented at the hearing, and the relevant legal authorities, the Court recommends that the Defendant's Motion to Suppress [Doc. 68] be **DENIED**.

## I.     POSITIONS OF THE PARTIES

This case arises out of the December 1, 2021 stop by Knoxville Police Department ("KPD") Officer Anthony Bradley ("Officer Bradley") of a gray Chevrolet Trailblazer driven by

Defendant westbound on Interstate 640, as Defendant Christie and his passenger, Codefendant Newland, were traveling through Knoxville to Atlanta, Georgia. As a result of a subsequent search of the vehicle following an open-air dog sniff, officers discovered seven wrapped packages containing approximately seven and one-half pounds of methamphetamine, a large amount of cash, and several firearms. Defendant and Newland were charged with conspiring to distribute and possess with intent to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), -(b)(1)(A), and 846; aiding and abetting each other in possessing with intent to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and 18 U.S.C. § 2; and two counts of aiding and abetting each other in possessing firearms in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) and 18 U.S.C. § 2 [Doc. 15].

Defendant asserts all evidence obtained as a result of the traffic stop must be excluded on the following grounds: Officer Bradley violated Defendant's right to equal protection under the Fourteenth Amendment and as contained in the Fifth Amendment's Due Process Clause by selectively enforcing a traffic law based on Defendant's race and gender [Doc. 68, pp. 2–16]; the initial traffic stop was excessively prolonged [*Id.* at 16–22]; Defendant was frisked without reasonable suspicion and arrested without probable cause [*Id.* at 17–18]; any statements made by Defendant to Officer Bradley were in violation of *Miranda* [*Id.* at 23–24]*;* and Defendant's consent to search his cellphone was involuntary [*Id.* at 24–25].[1]

---

[1] Defendant previously filed a suppression motion [Doc. 26], while represented by prior counsel. The parties asked to continue the hearing on this motion to pursue plea negotiations [Doc. 34, Minutes]. At a status conference on July 6, 2022, the parties advised that they were filing a plea agreement that day, which would render the suppression motion moot [Doc. 39, Minutes]. Based on these representations, the Court entered an Order finding the suppression motion to be moot [Doc. 35]. Thereafter, Defendant requested and received new counsel [Doc. 53] and was permitted to withdraw from his plea agreement before entering a guilty plea [Doc. 60]. Defendant states the instant suppression motion stands alone and does not incorporate the prior suppression motion by reference [Doc. 68 p. 2]. The Government filed a "replacement response" [Doc. 69 p. 2].

Defendant asserts that the stop of the vehicle by Officer Bradley "violated his right to equal protection under the Fourteenth Amendment and as contained in the Fifth Amendment's due process clause because the stop was deliberately based upon the unjustifiable standards of [Defendant's] race and gender" [Doc. 68 p. 2]. Defendant maintains that the appropriate remedy for this equal protection violation is suppression [*Id.* at 12]. He states that civil lawsuits brought by non-white motorists alleging police violation of equal protection rights have not resulted in systemic change, whereas the exclusion of all evidence stemming from a racially motivated stop may curb future equal protection violations [*Id.* at 16].

The Government responds that "the Sixth Circuit has refused 'to graft [the exclusionary rule] into the equal protection context'" [Doc. 69 p. 6 (citing *United States v. Nichols*, 512 F.3d 789, 794 (6th Cir. 2008), *overruled on other gnds as recognized in United States v. Buford*, 632 F.3d 264, 269 (6th Cir. 2011)]. The Government contends that the Court is bound by the Sixth Circuit precedent on this issue and that a civil action pursuant to 42 U.S.C. § 1983 is the proper remedy for any alleged violation of the Equal Protection Clause by a law enforcement officer [*Id*].

Defendant further asserts that the stop violated the Fourth Amendment because it was unnecessarily prolonged [Doc. 68 p. 16]. As a part of this argument, Defendant contends that the officer frisked him without reasonable suspicion that he was armed and dangerous and that his detention in the police car was tantamount to an illegal arrest [*Id.* at 20]. Defendant asserts that his illegal frisk and arrest, along with the officer's abandonment of the traffic investigation, prolonged the stop beyond its purpose, rendering the sniff of his vehicle by a drug detection unconstitutional [*Id.* at 18].

The Government responds that law enforcement properly stopped Defendant's vehicle for a traffic violation and while conducting the traffic stop, gained reasonable suspicion that criminal activity was afoot [Doc. 69 p. 9]. It asserts that Officer Bradley took reasonable actions to assure

3

his safety and the safety of Defendant and his passenger by frisking Defendant and seating him in his patrol car [*Id.* at 9–10]. The Government maintains that the officers obtained probable cause to search Defendant's vehicle based upon the positive alert by a drug detection dog which occurred while the investigation was ongoing and did not prolong the stop [*Id.* at 10]. Finally, it contends that even if some parts of the stop were improper, the Court should not apply the exclusionary rule because the officers' actions were not deliberately, recklessly, or grossly unconstitutional [*Id.* at 17].

Defendant also contends that Officer Bradley's interrogation of him violated his Fifth Amendment protections under *Miranda v. Arizona* [Doc. 68 p. 23] and that he did not voluntarily consent to the search of his cellphones because of the earlier violation of his rights [*Id.* at 24].

The Government responds that Defendant was not entitled to the *Miranda* warnings while questioned during the *Terry* stop and was provided the *Miranda* warnings and signed a rights waiver before voluntarily consenting to the search of his two cellphones [Doc. 69 pp. 5 &17–18].

## II.    SUMMARY OF THE EVIDENCE

During the March 2, 2023 hearing, the Government presented the testimony of Officer Bradley. Defendant presented no witnesses. The Government offered the following exhibits: video from Officer Bradley's patrol car dash camera [Exh. 1]; video from Officer Bradley's body camera [Exh. 2]; video from Officer Bradley's in-car camera [Exh. 3]; signed Advice of Rights Form [Exh. 4]; Signed Consent Form [Exh. 5]; aerial map [Exh. 6]; and video of Defendant Christie at the DEA office [Exh. 7]. The Court summarizes Officer Bradley's testimony as follows:

Officer Bradley has worked for the Knoxville Police Department since February of 2017, and for the past two years, he has been assigned to the interdiction task force under the Organized Crime Unit [Doc 75 p. 5]. Prior to his role on the interdiction task force, he was assigned to patrol

4

in the west district, generally in the area bordered by Western Avenue, Interstate 640 ("I-640"), and Interstate 275 (I-275") [*Id.* at 6]. As a patrol officer, his primary job responsibilities involved basic patrol operations, including protecting and serving, answering calls for service, being proactive, stopping cars, and investigating crimes [*Id.*]. As an interdiction task force officer, he is not assigned to a specific area and explained that such officers are responsible for placing themselves in the best location to conduct high-level traffic stops based on their knowledge of the area [*Id.*].

Officer Bradley testified that he received several hundred hours of specialized interdiction training about how to identify and intercept illegal criminal activity, including driving behaviors, interview techniques with focus on details and abnormalities during interviews, and concealment of illegal items within a vehicle [*Id.* at 6–7]. In terms of types of behaviors, Officer Bradley explained they are trained to look for anything that is odd or out of the ordinary, which may warrant further investigation, such as an individual trying to tuck their vehicle in between two larger vehicles and the driver's reaction to the officer's presence sitting roadside by trying to hide behind a B pillar,[2] pulling their hat down, or looking in the opposite direction [*Id.* at 7–8]. He also testified that in his interdiction role, he receives training relating specifically to narcotics trafficking, including frequent updates about the trends in the area and the local drug corridors as well as updates on different concealment methods [*Id.* at 8]. Officer Bradley identified I-640 as one of the largest local drug corridors because it creates a shortcut between Interstate 75 and Interstate 40 and stated that the drug interdiction officers patrol that corridor frequently [*Id.*]. He testified that they also work the interstates as well as city streets and other areas where there are a lot of drug activities or drug complaints [*Id.* at 8–9].

---

[2] Officer Bradley later explained that a vehicle has three different pillars—A, B, and C—and that drivers will sometimes lean back to hide behind the B pillar of the car. [Doc. 75 p. 12].

Officer Bradley explained that drug interdiction officers set up in an area where they will see the most traffic [*Id.* at 9]. He noted that in learning the way narcotics flow from north to south and east to west, they strategically place themselves on I-640 because it allows them to observe the traffic flow from drug hubs such as Detroit, Chicago, Ohio, West Virginia, Atlanta, and Miami, with Knoxville currently being "a middleman hub" [*Id.*]. In addition to identifying strategic locations, Officer Bradley detailed other factors that interdiction officers are trained to consider when deciding where to set up and observe traffic [*Id.* at 10]. He stated that local and national trends indicate that drug traffickers travel during high-traffic times of the morning, at lunchtime, and the "going-home rush," because there is a lot of traffic among which drug traffickers can blend in and conceal themselves, so the officers are present during those times [*Id.*]. While serving as an interdiction officer, Officer Bradley testified that he has conducted several hundred traffic stops. [*Id.*].

Focusing on driving behaviors, Officer Bradley testified that interdiction officers look for reactions to the presence of officers in patrol cars, such as ignoring the officers, performing an evasive maneuver in an effort to conceal oneself, hitting the brakes quickly, and moving over a lane when speeding [*Id.* at 10–11]. He stated that it is very common for someone to slow down, look at the speedometer, grab the steering wheel with both hands, and move to the slow lane when seeing a police officer on the side of the road [*Id.* at 11]. While that reaction would not cause an immediate concern, he noted, again, the things that might alert him to something more going on such as the driver leaning back to hide behind the B pillar or trying to hide their face by looking away as they pass, taking a drink, or pulling down a hat [*Id.* at 11–12]. Officer Bradley testified that he was trained to make these observations quickly and that once he sees an individual engaging in that type of behavior, he will then follow the vehicle, observing the driver and the vehicle to see if any violations occur [*Id.* at 12–13]. He stated that if the driver is speeding and nothing else is

6

going on, he may give a warning, but with anything out of the ordinary, he would do some further investigation [*Id.* at 13–14].

In further explaining a stop, Officer Bradley stated that when he pulls someone over on a major highway, like I-640, with a high volume of traffic traveling at a high rate of speed, he takes certain precautions to maintain safety, including always making a passenger-side approach to the stopped vehicle [*Id.* at 14]. He testified about the typical steps he takes in a traffic stop such as making his introduction and asking for credentials (driver's license, registration, and insurance) [*Id*. at 14–15]. He stated that while performing these tasks, he pays attention to every detail, looks inside the vehicle for items in plain view, notices odors, and observes how the occupants are acting as they talk to him [*Id*. at 15]. If he does not detect anything else, Officer Bradley stated he returns to his car, performs a records check in NCIC,[3] and begins filling out the ticket, whether it be a warning or actual citation [*Id.*]. If he observes any red flags or notices anything unusual, then he investigates further and asks more detailed questions [*Id.*]. He added that the procedure for each traffic stop differs based upon the totality of the circumstance before him [*Id.* at 16].

When patrolling as a drug interdiction officer, Officer Bradley explained that he and his partner, Officer Cloyd, will position their patrol cars together, and they will sit door to door as they watch the same traffic flow [*Id.* at 16–17]. He described his patrol vehicle as an unmarked, black Charger with black wheels and black tint [*Id.* at 17]. It does not have exterior lights, except for lights around the license and the grill. However, given that they position the cars in interstate cut-throughs for authorized vehicles only, Officer Bradley said his vehicle is obviously a law enforcement vehicle [*Id.*].

---

[3]     Officer Bradley explained NCIC is a database that he checks to see if someone is wanted either nationwide or locally. [Doc. 75 p. 15].

When asked how he would investigate a stop after observing concerning behavior, Officer Bradley responded that he would structure the approach the same way by introducing himself, explaining the reason for the stop, and observing everything that is going on as he talks to the occupants, "even down to their body positioning" [*Id.*]. He stated that he also looks for prefight or flight indicators, asks unemotional questions, and if there are multiple occupants, he questions them separately [*Id.* at 18]. If there is only one occupant, then he will ask them to gather their credentials and go back to his patrol car where he conducts a further interview [*Id.*].

In terms of a motorist showing signs of prefight or flight indicators, Officer Bradley explained that he looks for the following while engaging the motorist in conversation: body positioning,[4] unnecessary sweating, rapid or shallow breathing, self-grooming, rubbing their arms and legs while speaking, lighting a cigarette, avoiding eye contact, and seeing a heartbeat through the shirt or a pulsating carotid artery [*Id.*]. He stated that if he tells the motorist the plan is to issue a warning, that usually gives a sense of ease making indicators unlikely [*Id.* at 18–19]. However, if those indicators are present, he knows that more is going on, and he will ask the occupants to step out of the vehicle [*Id.* at 19]. He will then continue to observe them, watching for the same behavior as he asks more detailed questions about their travel plans, the duration, origin, and destination of travel, as well as questions about the vehicle occupants and their relationship to each other [*Id.*]. If he observes prefight or flight behavior, Officer Bradley stated that indicates to him that he should further investigate [*Id.*]. In addition to motorists' behaviors, Officer Bradley noted that other facts, such as whether the subject vehicle is owned by a third-party, a rental company, or someone other than the occupant of the car, may be relevant to an investigation [*Id.* at 19–20]. He explained that oftentimes, those involved in drug trafficking or other criminal activity use third-

---

[4]     Later in his testimony, Officer Bradley said a person will "blade" the body in order to block the officer's view of an object.  [Doc. 75 p. 20].

party vehicles [*Id.*].  Officer Bradley was asked whether he took any different steps in a traffic stop when he observed these behaviors [*Id.* at 20].  He responded that he did, particularly with his interview [*Id.* at 21].  He explained that if the indicators are present, he will ask if there is anything illegal in the car and then describe what he means by illegal items in greater detail, typically reciting a list to include weapons, bulk currency, narcotics such as marijuana, methamphetamine, heroin, and prescription pills [*Id.*].  As he is doing that, he looks for the motorist's reaction to the question and the way they answer the question, trying to detect a pattern or a break in pattern [*Id.*].  Officer Bradley explained that lack of eye contact, very exaggerated head nodding, hand movement, head movement, and similar behaviors and cues that he learned in his training as well as observed in conducting traffic stops would arouse his suspicion [*Id.* at 21–22].

With regard to the events of December 1, 2021, Officer Bradley testified that around noon and during the lunchtime rush, he was working as an interdiction officer at I-640 observing the westbound traffic [*Id.* at 22].  The Government played the video recording from Officer Bradley's vehicle's dash camera [Exh. 1], as Officer Bradley narrated [*Id.*].  He described looking westbound,[5] observing driving behaviors and looking at individuals' reactions to his presence in the median [*Id.* at 23-25].  He noted that as a gray Chevy Trailblazer passed his line of sight, he observed the driver tuck behind the B pillar, which drew Officer Bradley's attention to the vehicle [*Id.* at 25-26].  As Officer Bradley pulled onto the road and got behind the vehicle, he observed the driver looking into his sideview and rearview mirrors [*Id.* at 26].  He had also observed a traffic violation in that the Trailblazer was following too closely to the vehicle in front of it [*Id.*].  He explained that a lot of rear-end accidents occur on this stretch of highway due to following too

---

[5]     Officer Bradley noted that the dash camera only showed what was directly in front of him but that he could see much farther westbound and eastbound than depicted in the video.  [Doc. 75 p. 24].

9

closely and speeding [*Id.* at 27-28]. When Officer Bradley pulled the vehicle over, it stopped between the on ramp from Western Avenue and the traffic lane of I-640 [*Id.* at 27]. Officer Bradley noticed that the turn signal was left on after the vehicle came to a stop [*Id.* at 29].

The Government then played the video from Officer Bradley's body camera [Exh. 2; *Id.* at 30]. As he initiated the traffic stop, he testified that he was looking for additional occupants that he might not have seen, movement inside of the vehicle, and luggage, either an excessive amount or lack thereof, given that the vehicle had an out-of-town license plate [*Id.* at 31]. In addition, as he approached the passenger side window, he saw scent-masking agents[6] in an unusual spot, which was on the gear stick in the middle console [*Id.* at 31–32]. Officer Bradley testified that he began his typical traffic stop questions, asking Defendant to find his registration and insurance [*Id.* at 32]. He stated Defendant had trouble locating the documents, and around that time, Officer Cloyd arrived on scene [*Id.*]. Defendant gave Officer Bradley his Massachusetts driver's license, and Officer Bradley noted the license plate revealed the Trailblazer was registered in Pennsylvania. [*Id.* at 32–33]. Officer Bradley testified that he also noticed the passenger (Newland) appeared concerned about the whereabout of Officer Cloyd, who had arrived to back him up and assist with the traffic stop [*Id.* at 33]. After watching another portion of the video, Officer Bradley was asked if he had observed anything unusual in the clip [*Id.*]. He replied that it was odd to him that Defendant had not found the registration by that point [*Id.*]. Officer Bradley said, also, when Officer Cloyd approached, he observed Newland self-grooming by touching his hair and noted that Newland appeared concern about what might be going on [*Id.* at 33–34].

According to Officer Bradley, Newland then called the vehicle's owner to ask where the registration was located, which caused Officer Bradley to realize the Trailblazer was a third-party

---

[6] He described these as the "scent trees everyone buys" and that would typically hang from the rearview mirror or a turn signal. [Doc. 75 p. 32].

10

vehicle and raised more red flags for him [*Id.* at 34]. As the body camera video resumed, Officer Bradley testified that the occupants gave him the registration and proof of insurance about three minutes after the stop [*Id.* at 34–35]. He noted that during that time, he observed Defendant's hand trembling while holding the paperwork and a cellphone[7] [*Id.* at 35]. He stated that the trembling was to the point that he notified his partner of what he was observing at the window by looking back at Officer Cloyd and shaking his hand to indicate that Defendant was shaky [*Id.*]. Officer Bradley testified that given his observations and the extended amount of time needed to produce the registration, he asked Defendant to exit the car and go back to the patrol vehicle for further investigation [*Id.*]. Officer Bradley stated that he had decided to ask some questions about where they were traveling and to question them separately to see if there were any inconsistencies in their answers, which would indicate to him that something more was going on [*Id.* at 36].

As Defendant stepped out of the car, Officer Bradley noticed that he had a water bottle with him, which Officer Bradley thought was extremely odd [*Id.*]. He explained that people tend to drink water to combat dry mouth caused by being anxious and nervous and noted that up to that point, he had only asked about where they were headed [*Id.*]. Officer Bradley stated that Defendant answered his question with a question and responded with "huh" several times during the interview, which indicated deflection or "just trying to buy time to come up with an answer that's going to make sense" [*Id.* at 36–37]. While conducting the interview of Defendant, Officer Bradley stated he received a notification that another officer needed emergency assistance, so he told Officer Cloyd to go and assist [*Id.* at 37]. Officer Bradley then continued to question Defendant, who responded that he was originally from Massachusetts, lived in Pennsylvania, but

---

[7]     The video recording reveals that while they were searching for the vehicle's registration, Newland called a third party and then passed the cellphone to Defendant.

now lives in Atlanta with his parents [*Id.* at 38]. Defendant further responded that he and Newland had left Pennsylvania the night before around 8:00 p.m. [*Id.*]. When asked if they had stopped anywhere, Defendant replied that they stopped in Ohio and stayed at a hotel [*Id.*]. Officer Bradley then asked which hotel and stated that Defendant replied, "huh?" and that he took an extended amount of time before answering that he stayed at a Hilton [*Id.*]. Officer Bradley testified that due to Defendant exhibiting many red-flag behaviors his suspicion increased at that point and that he wanted to get the Defendant's story down [*Id.* at 38–39].

Officer Bradley then asked Defendant the name of the passenger to which Defendant again responded, "huh?" [*Id.* at 39]. Defendant then told Officer Bradley a name that the passenger went by but not his real name, after which Defendant stated the passenger's name was "Shemar" [*Id.*]. Defendant was unable to provide a last name [*Id.*]. Officer Bradley testified that his suspicions were continually growing due to the inconsistencies in Defendant's answers [*Id.*]. He noted that earlier in the interview, Defendant stated that he lived in Atlanta with his parents, but later he said he did not live in Atlanta [*Id.* at 39–40]. Officer Bradley also noted that Defendant went off topic about marital issues and drifted into a different conversation not related to the traffic stop [*Id.* at 40]. Based on the inconsistencies, Officer Bradley decided to question the passenger and placed Defendant inside the police car while he did so for Defendant's safety and to ensure he did not flee [*Id.*].

The video of Officer Bradley's body camera continued to play as he spoke with Newland [*Id.* at 41]. When he asked Newland where he lived, Newland stated he was just visiting, and Officer Bradley testified that it was never clear whether Newland lived in Massachusetts, Pennsylvania, Atlanta, or Jamaica [*Id.*]. Officer Bradley stated that Newland provided the name "Chalice" for Defendant, causing him to think they really did not know each other well, although Defendant had told him they had been friends for seven months [*Id.* at 41–42]. Officer Bradley

12

noted Defendant and Newland were also unclear about how they met with Defendant saying they met in Atlanta and Newland stating he knew Defendant from Jamaica [*Id.* at 42]. Once Newland gave Officer Bradley the name of "Chalice" for Defendant, Officer Bradley went back to Defendant to ask his name or what people call him [*Id.*]. He testified the Defendant gave him two more names, including "Chalice" [*Id.*].

Officer Bradley had not yet run the registration or the driver's license, testifying that he was trying to "get their story straight" [*Id.* at 42–43]. As he further questioned Defendant, who was seated in the back of the police cruiser, Office Bradley explained he was still looking for changes in behavior while asking about matters that may be relevant to the traffic stop [*Id.* at 43]. He noted that each time he asked Defendant a question, Defendant would break eye contact and that Defendant's eyes widened when Officer Bradley asked him about firearms, indicating deception [*Id.*]. He also noted that Defendant was getting mad at himself because he could not remember the passenger's last name [*Id.*]. When asked about what might be found in the car such as heroin and pills, Officer Bradley described Defendant's reaction as being a very exaggerated "no" and stated that Defendant did not really answer the question about methamphetamine, but rather started saying he did not smoke or do other things [*Id.* at 43–44]. At that point, which was about thirteen minutes and forty-five seconds into the stop, Officer Bradley decided to dispatch a K-9 to the scene [*Id.* at 44].

Officer Bradley testified that after calling for the K-9 unit, he walked over to the passenger side of the vehicle to remove Newland in accordance with policy requiring removal of occupants prior to a K-9 sniff and to ask more questions of him to gauge any inconsistencies with the information from Defendant [*Id.*]. Officer Cloyd then returned to the scene [*Id.* at 45].[8]   Officer

---

[8]   Officer Bradley testified that he had not yet run the NCIC check, which officers are supposed to run on everyone with whom they come into contact [*Id.* at 45].

13

Bradley updated him on what happened in terms of the stop while he had been gone to assist the officer in distress, and he instructed Officer Cloyd to put Newland in the back of his (Officer Cloyd's) car so he was not standing near traffic and was separated from Defendant [*Id.* at 45–46].

Officer Bradley returned to his patrol car to run a warrant check on both Defendant and Newland and to check the status of Defendant's driver's license [*Id.* at 46]. He also looked up their car in the Flock system to see if any cameras captured the car in locations that corresponded to their claimed travel [*Id.*]. He explained that the search in the Flock system takes several minutes [*Id.* at 47]. During that time, while waiting for results of the NCIC check and for the K-9 unit to arrive, Office Bradley continued to talk to Defendant, who was still seated in the back of his patrol car [*Id.* at 49]. He stated Defendant continuously asked about his driver's license and what was going on with the traffic stop [*Id.*]. When Officer Blake arrived with the K-9, which was approximately 21 minutes into the stop, Officer Blake approached Officer Bradley's driver-side window [*Id.* at 50]. Office Bradley advised him about the situation and asked him to run the dog around Defendant's vehicle, while he continued to wait on the records and Flock system checks [*Id.*].

As Officer Bradley worked on the citation in his patrol car, Officer Blake deployed the K-9 to conduct a sniff of the exterior of the vehicle [*Id.*]. Officer Bradley testified that when the K-9 reached the passenger side door, it positively alerted on the vehicle [*Id.* at 51]. Officer Bradley advised Officer Cloyd to block off a lane of traffic, and then they initiated a search of the vehicle [*Id.*]. Officer Bradley testified that the officers discovered around seven pounds of methamphetamine, six firearms, and over ten thousand dollars in cash [*Id.* at 51–52]. The methamphetamine was found in a suitcase in the back cargo area and firearms were scattered throughout the vehicle, including an AR-15 style rifle that had been disassembled and placed inside a sealed and glued box for a barstool [*Id.* at 52]. Due to the amount of narcotics discovered, Officer

14

Bradley contacted Drug Enforcement Agency ("DEA") Task Force Officer Wilson [*Id.* at 53]. Officer Bradley testified that, at that point, he issued *Miranda* warnings to Defendant, and while the officers continued the search of the car, they planned to let the DEA handle anything further with Defendant and Newland [*Id.* at 53–54].

The Government next played the video from the rear-facing in-car camera of Officer Bradley's patrol car [*Id.* at 54; Exh. 3]. The video started earlier in the stop when Officer Bradley put Defendant in the backseat of the car [*Id.* at 55]. Officer Bradley testified that at the seventeen minute and seventeen second mark on the video, he explained to Defendant that the K-9 alerted to the odor of narcotics and added that he told Defendant if he was honest with him, he would take that into consideration[9] [*Id.* at 56]. At the 23:44 time stamp on the video, while the search of the vehicle is on-going, Officer Bradley testified he did not ask any additional questions of Defendant and did not have further interactions with Defendant after the officers found the narcotics in the vehicle [*Id.* at 56–57].

On cross-examination, Officer Bradley was asked about several training and operational matters [*Id.* at 57]. First, he was questioned about the use of belt microphones [*Id.* at 58]. He explained that when he joined KPD in 2017, officers were issued only belt microphones, but at some later point, they were issued body cameras [*Id.*]. At the time of the stop in this case, officers were allowed to mute their body cameras during an investigation [*Id.*]. Officer Bradley said that policy has since changed and such is disallowed unless permitted by a supervisor [*Id.*]. He was also asked about his training in vehicle stops and confirmed that he understood a stop could not be based on mere suspicion but required some sort of moving violation or problem with the car [*Id.*

---

[9]    This purported statement by Officer Bradley—that he would take Defendant's honesty into consideration—is not on the video recording during the time both Officer Bradley and Defendant were in the patrol car together before the search of Defendant's vehicle.

15

at 59].  Defense counsel then asked Officer Bradley whether he had been trained to appropriately

testify in court, including to eliminate filler words like "um," which Officer Bradley confirmed

[*Id.* at 59–60].  Finally, he was questioned about how citations and warnings, that did not require

a report, were "memorialized in police records" [*Id.* at 60].  Officer Bradley responded that they

could be searched by date of issuance [*Id.*].

Next, defense counsel questioned Officer Bradley about an aerial map [Exh. 6], described

as the I-640, I-75, I-275 interchange [*Id.* at 61].  He was asked to mark where he and Officer Cloyd

were positioned in the cut-through where only law enforcement and authorized vehicles are

allowed [*Id.* at 63].  He confirmed that their purpose was both traffic enforcement and drug

interdiction, and that he was looking for odd behavior of vehicle occupants [*Id.* at 64].  Turning

back to Officer Bradley's dash camera video [Exh. 1], he was asked whether he pulled over

different cars depicted on the video:  two cars following too closely at 17:10:46; a sedan following

a fuel truck too closely in the far-right lane; a pickup truck following a sedan too closely at

17:11:18; and a pickup truck not maintaining its lane at 17:11:20.  Officer Bradley testified that he

did not pull over any of these vehicles [*Id.* at 64–66].

Then, defense counsel questioned Officer Bradley about his body camera video [*Id.* at 67;

Exh.2].  Pausing at 12:12:12, Officer Bradley was asked whether Defendant's right hand was

shaking to which he responded, "Not that I was observing at that time" [*Id.*].  It was noted that at

that point in the stop, Officer Bradley was explaining that he would likely only give them a warning

[*Id.*].  The video was then advanced and paused at 12:12:50, and Officer Bradley was asked about

the air fresheners at the bottom of the gear shift [*Id.* at 68].  He agreed that it would be possible to

have too many air fresheners hanging on a rearview mirror because they could obstruct the view

of the road [*Id.* at 69].  As the video resumed, Office Bradley was asked whether he was mistaken

about finding a firearm in Defendant's coat rather than underneath the driver's seat, but he replied

16

that a firearm was in each location [*Id.*]. Defense counsel then started the video at 12:12:55 and asked Officer Bradley to identify when he saw Defendant's hand shaking [*Id.* at 69–70]. Officer Bradley stated it was when Defendant first grabbed the white sheet of paper, which was around 12:14:07 [*Id.* at 70]. The video was advanced and paused again at 12:14:29 when Defendant and Newland are looking through the glove compartment for paperwork [*Id.*]. He was asked whether it was unusual for someone to fumble through papers in their glove box to find a registration, to which he responded, "no," but added it typically only takes five to ten seconds [*Id.*] At 12:15:51, Officer Bradley was handed the registration and proof of insurance [*Id.*].

Advancing the video to when Defendant gets out of the Trailblazer, goes to the back of his car as instructed, and is patted down, Officer Bradley was asked whether he observed any odd behavior [*Id.* at 71]. Officer Bradley testified that he observed a bit of nervous laughter and that Defendant had trembling hands [*Id.*]. Advancing the video to around 12:17:09, Officer Bradley confirmed that Defendant told him he was from Massachusetts but staying with family in Atlanta [*Id.* at 71–72]. He further confirmed that Defendant kept providing additional unsolicited information such as Defendant's issues with his wife and that he was going back to school for real estate, neither of which Officer Bradley asked him about [*Id.* at 72–73]. When asked whether some of Defendant's responses of "huh?" to Officer's Bradley's questions could have been because he could not hear well, Officer Bradley responded that he did not think so because he was speaking loud enough to where they understood each other [*Id.* at 72].

Defense counsel forwarded the video to 12:22:38 when Officer Bradley began to ask Defendant about illegal items in the car and asked Officer Bradley to identify points at which he believed Defendant's body language or demeanor changed [*Id.* at 73]. Officer Bradley identified several instances, beginning at 12:22:46, when Defendant would not maintain eye contact and instead looked forward or away or closed his eyes and twice when Defendant shook his head "no"

17

[*Id.* at 73–74].  Officer Bradley also pointed to a time when Defendant said "no" in a very exaggerated manner when asked about heroin or pills and noted, again, that Defendant did not answer the question about methamphetamine [*Id.* at 74].

In continuing to identify points of unusual behavior, Office Bradley further pointed to when he asked Defendant about Newland's last name [*Id.* at 74–75].  He explained that Defendant got mad at himself for not knowing the name, which was around 12:23:59 [*Id.* at 75].  At 12:24:20 Officer Bradley commented that Defendant appeared nervous, but Defendant responded that he had nothing to be nervous about [*Id.*].   Between 12:24:31 and 12:26:00, Officer Bradley commented on Defendant's hands shaking, and he was asked whether Defendant had told him about being shot earlier in the year [*Id.*].  Officer Bradley responded that Defendant had informed him about that incident but added that, when Defendant made the statement, he pointed to his left arm/shoulder area, and was handing documents to Officer Bradley using his right [*Id.*]. Officer Bradley was then asked to review portions of the video such his interactions with Newland starting at 12:25:42, confirming that Newland presented his Jamaican passport for his requested identification; his muted conversation discussing the case with Officer Cloyd at 12:27:06; and then his retrieval of Defendant's license, registration, and insurance before getting back into the patrol car at 12:28:18 [*Id.* at 76–80], which is 17:28:34 on his in-car dash camera [*Id.* at 80; Exh. 1].[10]

Officer Bradley was also asked to review portions of the video from his patrol car dash camera [Exh. 1].  He noted the following times and events:  At 17:28:49, Defendant asked Officer Bradley if something was wrong with his license, and Officer Bradley responded that he needed

---

[10]     The Court notes that Officer Bradley's dash camera recording [Exh. 1] and his body camera recording [Exh. 2] had different time stamp series, with his body camera indicating a time stamp of 1200 hours (noon) and his dash camera giving a time stamp of 1700 hours.  Officer Bradley testified that he does not align the time of his body and dash cameras at the beginning of his shift but, instead, makes sure they are charged and functioning [Doc. 75 p. 67].

18

to take care of some things and would explain everything later [Doc. 75 p. 80]. Around 17:29:21 Officer Bradley discussed with Defendant to whom the car belongs and their relationship [*Id.* at 81]. At 17:29:34, Officer Cloyd looked in the window of the Defendant's car [*Id.*]. At 17:29:39, Officer Bradley radioed to request the warrants check [*Id.* at 81]. At 17:29:52, Officer Bradley asked Officer Cloyd if he saw luggage and bags in the cargo area of the vehicle, which Officer Cloyd said he saw [*Id.* at 82]. At 17:30:01, Officer Bradley began giving Defendant's driver's license information and Newland's passport to the dispatcher to run the NCIC check [*Id.*]. At 17:30:48, Officer Cloyd told Officer Bradley that the officer-in-distress call took longer than he thought [*Id.* at 82–83]. At 17:31:51, Officer Bradley asked Officer Cloyd if he smelled anything at the window of Defendant's vehicle [*Id.* at 83]. Officer Bradley testified that he personally had not smelled anything unusual when he was at the window of the vehicle [*Id.*].

Officer Bradley confirmed that when the K-9 officer arrived that the officer briefly spoke to him and then went over to Defendant's car [*Id.* at 84]. He further confirmed that by 17:32:45, he learned there were no warrants on Defendant or Newland [*Id.*]. Officer Bradly also asked the dispatcher to check JIMS, which he explained was for local criminal history, and confirmed Defendant and Newland had none [*Id.* at 84–85]. Then, at 17:33:46, Defendant said an expletive and told Officer Bradley that they "stayed in Ohio last night and then a hotel the previous night," which Officer Bradley stated was a change in his story [*Id.* at 85].

Officer Bradley was next asked about his training concerning drug routes within the U.S. interstate system [*Id.*]. In response to questioning, he agreed that to get from Pittsburgh to Knoxville or Pittsburgh to Atlanta, the route would be down I-81 or traveling to Cincinnati to get to I-75 [*Id.*]. Officer Bradley was again questioned on the recording from his patrol car dash camera [Exh. 1] and testified as follows: The dog sniff occurred between 17:34:45 and 17:35:07, when the K-9 handler told Officer Bradley there had been a hit [*Id.* at 85–86]. Soon after, Officers

19

Bradley and Cloyd began the search of the vehicle [*Id.* at 86]. After finding a substance he could not identify, Officer Bradley read Defendant his *Miranda* rights and then asked him about the substance. [*Id.* at 87]. During that time, Officer Bradley told Defendant that the dog made a hit, indicating there were drugs in the car, and because Defendant said he had borrowed the car from somebody, Officer Bradley also explained to him that if someone had recently used that car and either used or had drugs on them, that could create a positive hit [*Id.*]. Officer Bradley and Officer Cloyd completed the search of the vehicle and removed the drugs and guns, but they were instructed to leave the currency they found in place for DEA to photograph [*Id.*]. They kept a running inventory of where things were found, and Officer Bradley stated he believed someone did a full inventory search, which would be on record with KPD or DEA [*Id.* at 87–88].

The cross-examination then focused on when Officer Bradley *Mirandized* Defendant as captured by the camera inside his patrol vehicle.[11] After Officer Bradley read Defendant his *Miranda* rights, Defendant asked "what the h*** was going on" [*Id.* at 88]. When Officer Bradley showed him what was later determined to be hashish and asked what it was, Defendant stated he did not know [*Id.*]. Officer Bradley then closed the door, leaving Defendant in the car alone, and Defendant stated, "What the f*** is going on in this vehicle?" [*Id.*]. Officer Bradley confirmed that he had no further substantive interaction with Defendant, while transporting him to the DEA office [*Id.* at 88–89].

On redirect examination, Officer Bradley was asked whether based on his training and experience, he had developed a base line of normal behavior during a traffic stop [*Id.* at 90]. He stated that he had and agreed that "normal behavior" is the behavior of innocent motorists [*Id.* at 90]. Officer Bradley testified that if someone's behavior is base line, then they only get a ticket

---

[11] The video was referenced as that played by the Government during direct examination but was not replayed during cross-examination.

or a warning [*Id.*]. However, if the behavior differs from the base line, he structures his traffic stop differently, conducting a more detailed interview [*Id.*]. He reviewed that development of base-line behavior would include how motorists react to ambient noise, their level of nervousness, their mannerisms and other body language, and other indicators previously discussed [*Id.* at 90–91]. Officer Bradley testified that at first, he observed the base-line behaviors in this case, but then he observed additional behavior that caused him to believe the occupants' behavior was not base line and informed his decisions to continue asking questions [*Id.* at 91].

Officer Bradley denied stopping every vehicle that commits a traffic violation when conducting interdiction patrol [*Id.*]. Rather, he stops vehicles when he observes a distinct reaction to the mere presence of police [*Id.* at 92]. Officer Bradley testified that what caught his eye on that day was Defendant trying to conceal himself behind the B pillar of the vehicle [*Id.* at 92]. He explained that he did not turn on his lights as he pulled out but did so only after observing a traffic violation [*Id.*]. Officer Bradley agreed that he occasionally makes simple traffic stops based only on a traffic violation and not necessarily on behavior-initiated reactions [*Id.*]. He explained those instances include such violations as speeding, following too closely, and failure to maintain one's lane [*Id.*]. He stated that it is part of his job duties as a police officer to protect public safety [*Id.* at 92–93].

## III.   FINDINGS OF FACT

Based upon the testimony and exhibits presented at the evidentiary hearing, the Court makes the following findings of fact:

Around noon on December 1, 2021, KPD Officer Anthony Bradley was in his patrol car in the median of I-640 at a cut-through for authorized vehicles, where he was monitoring traffic and conducting drug interdiction. While observing the lunchtime rush of traffic traveling west, he noticed the driver of a Chevy Trailblazer lean back to hide behind the vehicle's B pillar. Officer

21

Bradley pulled behind the Trailblazer and followed it, during which he saw the driver glancing in his sideview and rearview mirrors. Officer Bradley observed the Trailblazer following the vehicle in front of it too closely and activated his lights and siren to stop the vehicle.

The Trailblazer stopped between the on-ramp from Western Avenue and the traffic lane of I-640, so traffic was passing the vehicle on both sides. The Trailblazer's blinker remained on after it stopped (and throughout the traffic stop). Officer Bradley approached the Trailblazer on the passenger side, noticing that it had a Pennsylvania license plate. He also noticed several tree-shaped air-fresheners hanging from the gear stick in the center console, which he found to be unusual. Defendant was the driver, and Shemar Newland was in the front passenger seat.

Officer Bradley told the occupants that he had stopped them for following too closely because they were one car-length behind the vehicle in front of them, but he would likely give them a warning citation. He asked for Defendant's driver's license, registration, and proof of insurance. Officer Bradley's partner, Officer Cloyd, arrived on the scene of the stop, as Defendant was looking for the documents. Defendant handed Officer Bradley his Massachusetts driver's license. Officer Bradley noticed that the passenger appeared concerned with Officer Cloyd's location. It took Defendant some time to locate the registration, and during this time, Officer Bradley noticed Newland performing self-grooming actions by touching his hair. Newland called a third-party then gave the cellphone to Defendant to ask where the registration was located. Defendant then provided the registration and proof of insurance to Officer Bradley three minutes into the stop. Officer Bradley observed Defendant's hand trembling as Defendant was holding the cellphone and the paperwork. Officer Bradley signaled to Officer Cloyd that Defendant was shaking.

Four minutes into the stop, Officer Bradley asked Defendant to get out of the vehicle and join him at his patrol car. Defendant brought a water bottle with him, as he exited the car. Officer

22

Bradley frisked Defendant and began questioning him about his travel itinerary. Shortly after Defendant stepped out of the car, Officer Cloyd left to assist another officer with an emergency. In response to Officer Bradley's questions, Defendant said he was originally from Massachusetts, had lived in Pennsylvania, and was staying in Atlanta with family. Defendant said he and his passenger left Pennsylvania around 8:00 p.m. the night before and stopped at a hotel in Ohio. Defendant took an extended time to answer Officer Bradley's question about the name of the hotel but responded that it was a Hilton. Officer Bradley asked Defendant for the name of his passenger. Defendant first responded "huh?," then gave a name the passenger used, and finally responded, "Shemar." Defendant could not give the passenger's last name, although he said they had been friends for seven months. Defendant subsequently denied living in Atlanta and told Officer Bradley about marital issues he was having and that he was going back to school to study real estate. Officer Bradley then asked Defendant to sit in his patrol car.

Officer Bradley returned to the passenger side of the Trailblazer and questioned Newland, who stated Defendant's name was Chalice or Oraine Christie and that he knew Defendant from Jamaica. When asked where he lived, Newland responded that he was "just visiting" without giving a location. Officer Bradley returned to his patrol car and asked Defendant what peopled called him. Defendant responded that his friends call him "Chaz." Officer Bradley then asked Defendant whether the vehicle contained firearms and drugs, specifically asking about heroin and methamphetamine. He noticed that Defendant's eyes widened when he mentioned firearms. Defendant gave an exaggerated "no" in response to the question about heroin, but in response to Officer Bradley asking about methamphetamine, Defendant said that he did not smoke or do drugs. Officer Bradley also noticed Defendant breaking eye contact with him, each time he asked a question.

Thirteen minutes and forty-five seconds into the stop, Officer Bradley called for a K-9 unit to come to the scene. He then had Newland exit the vehicle. Officer Cloyd returned to the scene, and Officer Bradley updated him on the situation and asked him to put Newland in his patrol car. Around seventeen minutes into the stop, Officer Bradley collected Defendant's driver's license, registration, and proof of insurance from the hood of his patrol car and entered his patrol car to request a check for warrants in NCIC on both Defendant and Newland and to check the status of Defendant's driver's license. He also requested a check of the Trailblazer's license tag in the Flock system to see if the tag number had been captured on camera in the locations of their claimed travel. Officer Bradley received the results of the NCIC check, that neither occupant had any outstanding warrants, nearly four and one-half minutes after he reentered the patrol car. He next checked the JMS system for local criminal history but found none.

Twenty-one minutes into the stop, Officer Blake arrived on the scene with his drug detection dog. Officer Blake stopped briefly at Officer Bradley's window, and this was approximately two minutes after Officer Bradley had received the results of the NCIC check. Officer Bradley advised Officer Blake about the situation and asked him to lead the dog around the Trailblazer. When Officer Blake began the dog sniff, Officer Bradley was still awaiting the results of the Flock system check. He worked on the citation in his patrol car while Officer Blake deployed the drug dog around the Trailblazer. The dog positively alerted on the passenger-side door. The officers searched the Trailblazer and found seven pounds of methamphetamine in a suitcase in the cargo area, six firearms at various locations throughout the vehicle, and more than $10,000.

While in his patrol car working on the citation, Officer Bradley continued to talk with Defendant. Officer Bradley pointed out the point at which the drug dog alerted on the car and told Defendant the potential reasons a drug dog could alert on his vehicle. Officer Bradley did not

24

speak with Defendant following the search of the car and discovery of narcotics. After he and Officer Cloyd searched the vehicle, he advised Defendant of the *Miranda* warnings and asked Defendant about a leafy green substance found in the car. Defendant said he could not identify the substance. Thereafter, Officer Bradley transported Defendant to the DEA office but did not question Defendant about substantive matters again.

## IV. ANALYSIS

Defendant asks the Court to suppress the evidence stemming from the December 1, 2021 traffic stop due to violations of equal protection and his rights under the Fourth and Fifth Amendments. The Court will first address Defendant's equal protection claim and then analyze the remaining bases for his motion to suppress.

## A. Equal Protection Claim[12]

The Fourteenth Amendment provides, "No state shall deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Fourteenth Amendment applies only to the states, and in essence, it prohibits the states from treating citizens differently. *Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir. 1988) ("The equal protection clause of the Fourteenth Amendment requires the government to treat similarly situated individuals in a similar manner."). The Fifth Amendment contains no specific equal protection clause, but there is an equal protection component to the Fifth Amendment's due process requirement, prohibiting the federal government from discrimination if the discrimination is so unjustifiable that it violates the due process of law. *See, e.g., Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) (finding racial discrimination in the District of Columbia public schools violated due process of law as protected

---

[12] The Court did not hear evidence on the merits of Defendant's equal protection claim at the March 2, 2023 hearing but rather limited oral argument to the issue of whether an equal protection claim can be alleged as a basis to suppress evidence in a criminal proceeding.

25

by the Fifth Amendment). "The Liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor,* 570 U.S. 744, 774 (2013) (citing *Bolling*, 347 U.S. at 499-500).

Here, Defendant alleges that Officer Bradley, who is assigned to the interdiction task force, violated his "Fourteenth Amendment equal protection and/or the Fifth Amendment's promise of due process" by discriminating against him on the basis of his race and gender [Doc. 68 pp. 2–3]. He states that "those are the appropriate constitutional bases for challenging discriminatory application of laws" [*Id.* at 3]. He further argues that the proper remedy for such violation is the exclusion of all evidence obtained as a result of the December 1, 2021 traffic stop from the trial in this case. While acknowledging that this type of selective enforcement claim is typically pursued through a § 1983 civil action and that "suppressing the evidence in a criminal prosecution for the violation of a defendant's equal protection rights is not a common occurrence" [*Id.* at 13], Defendant maintains that such civil suits are unsuccessful in effectuating systemic change to prevent law enforcement violations of individuals' rights to equal protection under the law.

Defendant is correct in that applying laws in such a manner as to discriminate against individuals on the basis of race is a violation of the Equal Protection Clause of the Fourteenth Amendment. *Whren v. United States*, 517 U.S. 806, 813 (1996) ("the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment"); *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997) (determining that "selective enforcement of the law based on considerations such as race" is prohibited by the Equal Protection Clause). However, the question here is whether suppression of evidence is a proper remedy for a violation of Equal Protection rights, especially when Defendant claims the purported violation—the decision to conduct a traffic stop of Defendant—was

26

motivated by race but would result in the suppression of evidence that may have otherwise been lawfully obtained.[13]

The Government argues that our Court of Appeals has answered this question and that the law in the Sixth Circuit is that suppression of evidence is not an appropriate remedy for an alleged Equal Protection violation. *United States v. Nichols,* 512 F.3d 789, 794 (6th Cir. 2008), *overruled on other gnds* by *United States v. Buford,* 632 F.3d 264,(6th Cir. 2011). The undersigned agrees.

In *Nichols,* an officer observed a group of black men congregated around a vehicle, and finding the behavior suspicious, the officer ran a check on the vehicle's license tag. 512 F.3d at 791. Once the officer learned the vehicle was registered to the defendant, he ran a warrant check and learned that the defendant had an outstanding warrant for robbery. *Id.* at 792. The officer then detained the vehicle and arrested the defendant. *Id.* During a subsequent search of the vehicle, a loaded firearm was discovered, and the defendant was charged with being a felon in possession of a firearm. *Id.* at 791–93. The defendant then moved to suppress the firearm as evidence, alleging the officer violated his Equal Protection rights because his decision to run the tag and warrant checks was motivated by the defendant's race. *Id.* at 793.

While the *Nichols* court agreed that if the officer's decision to run the checks was motived by race, then the conduct "may violate the Fourteenth Amendment," it disagreed that suppression was the proper remedy. *Id.* at 794. The *Nichols* court noted, "we are aware of no court that has ever applied the exclusionary rule for a violation of the Fourteenth Amendment's Equal Protection

---

[13] In considering the implications of race-selective police stops, the Supreme Court concluded such motivations were irrelevant to a Fourth Amendment analysis. *Wren v. United States,* 517 U.S. 806, 812–13 (1996) ("We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

27

Clause, and we decline [defendant's] invitation to do so here. Rather, we believe the proper remedy for any alleged violation is a 42 U.S.C. § 1983 action against the offending officers." *Id.* (footnote omitted).

Defendant maintains that the rejection of the suppression remedy by the Sixth Circuit in *Nichols* is dicta because the court first found that the defendant had not made an adequate showing of discriminatory intent. Although the court did engage in an evaluation of the strength of the defendant's Equal Protection claim and found it to be lacking, this served as an alternative basis for the court to affirm the denial of the equal-protection claim, *see id.* at 795–96, but did not render the earlier part of the opinion rejecting the suppression remedy as non-binding. *See United States v. Cousin*, 448 F. App'x 593, 594 (6th Cir. 2012) ("[W]e agree with the district court that our recent decision in *United States v. Nichols* controls and precludes application of the exclusionary rule to Cousin's equal protection claim."); *see also United States v. Ford*, No. 1:11-cr-42, 2012 WL 5366049, at *4 n.1 (E.D. Tenn. Oct. 30, 2012) ("the Sixth Circuit has made clear the exclusionary rule does not apply to violations of the Equal Protection Clause").[14]

Under the current state of legal authority, and unless and until the Supreme Court or the Sixth Circuit decides otherwise, the application of the exclusionary rule to Defendant's equal protection claim is precluded. Accordingly, because the suppression of evidence is not an appropriate remedy for an Equal Protection violation by a law enforcement officer pursuant to

---

[14] In *United States v. Benitez*, the Southern District of Iowa characterized the Sixth Circuit's decision in *Nichols* as "equivocat[ing]" on the issue of whether suppression is an appropriate remedy for an equal protection violation. 613 F. Supp. 2d 1099, 1101–02 (S.D. Iowa 2009) (deeming "the remedy for an equal protection violation in the criminal setting [to be] uncertain"). However, three years after the decision in *Benitez*, the Sixth Circuit affirmed its holding in *Nichols*. *Cousin*, 448 F. App'x at 594 (holding *Nichols* precludes suppression as a remedy in for a claimed equal protection violation in a criminal case). Accordingly, the undersigned finds the Sixth Circuit's position on this issue to be clear.

28

*Nichols*, the undersigned **RECOMMENDS** that Defendant's motion to suppress and request for an evidentiary hearing on his equal-protection claim be **DENIED**.

**B. Fourth Amendment Claims**

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Defendant argues that law enforcement violated his rights under the Fourth Amendment, because Officer Bradley (1) unduly prolonged the stop beyond the time necessary to issue a traffic citation, (2) frisked him without reasonable suspicion, and (3) arrested him without probable cause. The Court examines each of these issues in turn.

*(1) Scope and Duration of Traffic Stop*

Officer Bradley testified that he stopped the Trailblazer driven by Defendant Christie after observing it following the vehicle in front of it too closely. If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993), *cert. denied*, 513 U.S. 828 (1994). Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion," *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct. *Ferguson*, 8 F.3d at 392 (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)). A stop based on probable cause that a traffic violation has occurred is reasonable, without regard to the subjective motives of the officer. *Whren*, 517 U.S. at 813; *Ferguson*, 8 F.3d at 391.

Tennessee Code Annotated § 55-8-124(a) provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and condition of the highway." While Tennessee state courts have not defined what constitutes a "reasonable and prudent" following distance under

29

§ 55-8-124(a), federal courts rely on either of two tests from the Tennessee Comprehensive Driver's License Manual ("Manual") to guide their analysis. *United States v. Howard*, 815 F. App'x 69, 73–74 (6th Cir. 2020) (citing Tenn. Dep't of Safety & Homeland Sec'y, Tennessee Comprehensive Driver License Manual 48–49 (July 1, 2018 ed.)); *United States v. Collazo*, 818 F.3d 247, 255 (6th Cir. 2016). Prior to 2010, the Manual instructed drivers to maintain one car-length of distance for every ten miles per hour of speed. *Id.* After 2010, the Manual "defines a safe following distance in terms of seconds rather than car lengths," providing that "drivers should generally maintain a following distance of at least two seconds" behind the preceding vehicle. *Howard*, 815 F. App'x at 74. "During 'interstate highway driving at higher speeds,' however, drivers should maintain a following distance of '[a] minimum of four seconds.'" *Id.* (quoting Manual at 49).

Here, the video recording from Officer Bradley's body camera reveals that he told Defendant he was following about one car length behind the preceding vehicle, when the law requires he be one car length for every ten miles per hour, or six car lengths—or at least, three to four—based on his speed [Exh. 2, 12:12:26]. Accordingly, the Court finds that Officer Bradley had probable cause to stop the Defendant's vehicle for a violation of Tennessee Code Annotated § 55-8-124(a).[15]

A stop "which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry v. Ohio*, 392 U.S. 1, 18 (1968). Once a court determines that a seizure was proper, it must still assess "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20. A traffic

---

[15]   Although Defendant's motion suggests that the officer lacked probable cause or reasonable suspicion to stop his vehicle [Doc. 68 p. 16], Defendant did not pursue this argument in either his brief or at the evidentiary hearing.

30

stop that is "based on probable cause and concededly lawful" can nevertheless "violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000).

The propriety of the investigation of a traffic violation is gauged by assessing whether the officer's actions are in furtherance of the purpose of the stop. *United States v. Whitley*, 34 F.4th 522, 529 (6th Cir. 2022) (observing that "our prior caselaw permitting de minimis extensions of traffic stops is no longer good law"). In addition to issuing a citation, actions such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are all typical inquiries incident to a traffic stop. *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). Unrelated investigations, such as "questioning and dog sniffs," are tolerated only if they do not extend the detention. *Whitley*, 34 F.4th at 529. However, "[i]f an officer has a reasonable and articulable suspicion of criminal activity, he may extend the traffic stop long enough to confirm or dispel his suspicions." *United States v. Johnson*, 482 F. App'x 137, 143 (6th Cir. 2012); *United States v. Sharpe*, 470 U.S. 675, 687 (1985) (assessing "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly" during a *Terry* stop); *see also Whitley*, 34 F. 4th at 529 ("If an officer exceeds the scope or duration of the traffic stop, he must have 'reasonable suspicion' to continue the stop on unrelated grounds.").

Here, approximately eighteen minutes elapsed from the time that Officer Bradley collected Defendant's driver's license, registration, and proof of insurance and the alert by the drug dog. Defendant argues that four minutes into the stop, Officer Bradley had everything necessary to

31

complete a citation. He contends that, instead of completing the citation and permitting Defendant to be on his way, Officer Bradley prolonged or abandoned the traffic stop by asking numerous questions unrelated to the stop, frisking him without reasonable suspicion to believe he was armed and dangerous, and detaining him in his patrol car without probable cause. He contends that the officer improperly extended the traffic stop to permit the arrival of a K-9 officer without reasonable suspicion of a crime.

Law enforcement may temporarily seize a person or vehicle, i.e., conduct an investigatory or *Terry* stop, if the officer has "reasonable suspicion" of criminal activity stemming from "specific and articulable" facts which the officer knew at the time of the seizure. *Terry*, 392 U.S. at 21–22, 27; *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994). Reasonable suspicion is a quantum of proof that is "considerably less" than a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch' that criminal activity may be afoot." *United States v. Bridges*, 626 F. App'x 620, 623 (6th Cir. 2015) (quoting *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir. 2013)); *see also Terry*, 392 U.S. at 27 (holding that an investigatory stop must be based on more than the officer's "inchoate and unparticularized suspicion or 'hunch'"). The presence of reasonable suspicion must be evaluated based on the totality of circumstance at the time the officer decided to make the investigatory stop. *Bridges*, 626 F. App'x at 623. Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (internal citation and quotations omitted).

Here, at the point that Officer Bradley received Defendant's paperwork, he knew Defendant, whose driver's license was from Massachusetts, was driving a vehicle belonging to another person with a Pennsylvania tag. Officer Bradley had noticed Defendant's attempt to hide

32

behind the B pillar when he initially passed the officers' patrol cars, repeated glances at Officer Bradley's patrol car while it followed him, and leaving the turn signal on after stopping. Defendant took longer than is typical to locate the car's registration and proof of insurance and his hand was shaking as he handed Officer Bradley his paperwork, despite Officer Bradley's prior statement that he would likely issue a warning citation. Officer Bradley also noticed that the passenger was concerned with Officer Cloyd's location and touched his hair, which Officer Bradley characterized as a self-grooming action that aroused his suspicion. Finally, Officer Bradley noticed multiple air-fresheners around the gear stick, a location out of view from a distance. Officer Bradley testified that based upon his training as an interdiction officer, these characteristics and events were red flags that indicated Defendant and his passenger could be engaged in criminal activity.

When evaluating the presence of criminal activity, officers may draw upon their training and experience "to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (internal quotation omitted). Officer Bradley testified that he had received several hundred hours of specialized interdiction training on identifying and intercepting illegal criminal activity. He related that he had conducted several hundred traffic stops as an interdiction officer. The Court finds that Officer Bradley's training and experience allowed him to make inferences from what otherwise seems like innocuous behavior, such as hiding behind the B pillar, touching one's hair, or having multiple air-fresheners. The Court finds that the red flags, considered in the aggregate, constituted articulable facts providing a reasonable suspicion for Officer Bradley to continue to investigate.

Officer Bradley then had Defendant step out of his car and questioned him about where he was from, his itinerary, and the identity of his passenger. At this point in the stop, Officer Bradley had yet to perform records checks on the status of Defendant's driver's license and for outstanding

33

warrants and his questions outside the car did not further the traffic investigation. However, questioning Defendant about his travel history and plans was reasonably targeted to either confirm or dispel Officer Bradley's growing suspicions. *See Whitley*, 34 F.4th at 530 (asking a motorist to exit the vehicle and questioning about matters unrelated to the traffic investigation is only appropriate if based on "independent reasonable suspicion"). Defendant's answers, particularly his hesitation about the name of the hotel where he stayed the night before and his inability to recall his passenger's last name, despite their friendship of seven months, served to further arouse Officer Bradley's suspicions. An individual's unexplained ignorance regarding the specifics of their own itinerary can give rise to reasonable suspicion. *Howard*, 815 F. App'x at 77–78.

After his initial questions to Defendant, Officer Bradley placed him in the patrol car and questioned Newland also about their travel itinerary and about Defendant. Officer Bradley stated that Newland, who was from Jamaica, seemed not to know Defendant and called him by a different name. Also, Newland told Officer Bradley that he knew Defendant from Jamaica, which was inconsistent with Defendant's statement that they met in Atlanta. Officer Bradley returned to Defendant, who was seated in the patrol car, and asked whether he went by any other names. He also questioned Defendant about whether the car contained had firearms, money, and controlled substances. Officer Bradley testified that Defendant's reactions to his questions—widened eyes, lack of eye contact, exaggerated "no," avoiding his question about methamphetamine—caused him to suspect that the car contained contraband based on his training. Following this series of questions, during which Defendant still could not recall Newland's last name, Officer Bradley called for a K-9 unit.

The Court finds that the ten-minute period during which Officer Bradley questioned Defendant and Newland about their travel itinerary and how they knew each other did not unconstitutionally prolong the traffic stop. It observes that during this time, Officer Bradley had

34

increasing reasonable suspicion that criminal activity was afoot, specifically that the vehicle contained illegal substances. The Court finds that during the remaining time until the arrival of the K-9 unit and through the drug detection dog's alert, Officer Bradley was performing tasks directly related to the traffic stop, such as conducting records checks and filling out the citation. Accordingly, the Court finds that the duration and scope of the traffic stop did not violate the Fourth Amendment.

*(2) Frisk*

Defendant argues that Officer Bradley conducted a Terry frisk of his person without reasonable suspicion that he was armed and dangerous. He asserts that the frisk not only violated his rights under the Fourth Amendment but also served to unjustifiably prolong the traffic stop.

Officer Bradley asked Defendant to step out of his car and frisked him approximately four minutes into the stop. An officer may properly ask the driver to exit the vehicle during a traffic stop. *Maryland v. Wilson*, 519 U.S. 408, 413-14 (1997). When Defendant stepped to the back of his car, Officer Bradley stated he would pat Defendant down to make sure he had no weapons. "'A concern for officer safety permits a variety of police responses in differing circumstances, including ordering a driver and passenger out of a car during a traffic stop, . . . and conducting pat down searches upon reasonable suspicion that they may be armed and dangerous.'" *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005)). The focus of the inquiry is whether the officer's conduct was reasonable "in light of the surrounding circumstances and [the officer's] suspicions." *Id.* Officer Bradley's frisk of Defendant took approximately six seconds, and Officer Bradley seized no evidence from Defendant's person [*See* Exhs. 1 & 2].

An officer may frisk an individual for weapons to assure the officer's safety, if a reasonable officer under those circumstances would be justified in believing the person was "armed and

35

dangerous." *Terry*, 392 U.S. at 27; *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016). "[A] frisk for weapons is justified only where specific and articulable facts give a[n officer] reasonable grounds to believe that an individual is armed and dangerous." *United States v. Bell*, 762 F.2d 495, 497 (6th Cir. 1985). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27; *Pacheco*, 841 F.3d at 394. The presence of specific and articulable facts is determined by examining the totality of the circumstances. *Joshua v. DeWitt*, 341 F. 3d 430, 443 (6th Cir. 2003); *Bell*, 762 F.3d at 499.

In this case, the totality of the circumstances fail to provide reasonable suspicion that Defendant was armed and dangerous when Officer Bradley frisked him. Here, the Defendant was stopped for a traffic infraction in the middle of the day on a highway. Nothing about the nature or timing of the stop itself suggested the vehicle's occupants were armed or dangerous. *C.f. Pacheco*, 841 F.3d at 393 (finding a stop at night in an area known for gang activity on a tip of drug trafficking contributed to reasonable suspicion). Additionally, Officer Bradley's interactions with the Defendant and Newland in the four minutes leading up to the frisk did not suggest the presence of weapons or danger. Defendant and Newland conversed cordially with the officer and were compliant with his requests for information and paperwork. *C.f. id.* (observing defendant failed to acknowledge officer or to comply with his commands). They did not make any furtive or unusual movements. *C.f. United States v. Graham*, 483 F.3d 431, 439 (6th Cir. 2007) (holding driver's reaching under his seat, as if accessing or hiding a weapon, along with an anonymous tip that the driver was armed, provided reasonable suspicion for a *Terry* frisk). Defendant was permitted to reach into the backseat and get his wallet from his jacket. Officer Bradley had no information suggesting dangerousness, such as knowledge of prior convictions or drug trafficking.

36

Officer Bradley's testimony that Defendant's hands were shaking indicated nervousness. However, the fact that an individual is nervous by itself does not provide reasonable suspicion for a frisk. *Pacheco*, 841 F.3d at 393 (holding that defendant's "extreme nervousness," which increased as the stop progressed, contributed to reasonable suspicion); *United States v. Noble*, 762 F.3d 509, 522–23 (6th Cir. 2014) (observing that nervousness is an unreliable predictor of dangerousness because many law-abiding citizens are nervous during traffic stops). Additionally, although two officers were present on the scene at the time of the frisk, Officer Cloyd left to respond to an emergency less than a minute after the frisk, leaving Officer Bradley alone to manage the traffic stop with two occupants. Looking at all the circumstances leading up to the frisk as a whole, the Court finds the frisk was unwarranted. Nevertheless, the Court does not find the brief pat down of the outside of Defendant's clothing prolonged the stop. As noted by the Government, the frisk did not yield any evidence. Thus, the Court finds that the frisk of Defendant, although improper, does not result in suppression of any evidence.

*(3) Detention in Patrol Car*

Defendant also asserts that Officer Bradley detained him in the back of his patrol car without probable cause that he committed any crime. Relying on *United States v. Richardson*, Defendant argues that when Officer Bradley placed him in the back of the patrol car, he was not free to leave and, thus, his detention was tantamount to an arrest. 949 F.2d 851, 857 (6th Cir. 1991) ("When the agents placed Richardson in the back of the police car, they went beyond the bounds of Terry . . . [and] crossed the line into an arrest."). He maintains that this illegal arrest also impermissibly extended the stop. The Government counters that an officer may detain a motorist in the back of a patrol car while the officer completes the citation. It asserts that Defendant's detention in the patrol car was reasonable because of the high-speed traffic on either side of Defendant's vehicle.

37

"Detention in a police car [during a traffic stop] does not automatically constitute an arrest." *United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996). "[A]n officer may detain an individual in a police cruiser until the officer has finished issuing a citation." *United States v. Shank*, 543 F.3d 309, 214 (6th Cir. 2008); *Bradshaw*, 102 F.3d at 212 (determining that detention in the patrol car until the officer completed records checks and issued a ticket was "well within the bounds of the initial [traffic] stop . . . [and] a legitimate exercise of valid routine police procedure"); *United States v. Betancourt*, No. 3:18-cr-087, 2019 WL 2928888, at *5 (S.D. Ohio July 8, 2019) ("[O]fficers may ask a driver to sit in a cruiser during the completion of the traffic investigation and citation process."). However, a "motorist [can]not be lawfully detained in a police car once the purposes of the initial traffic stop are completed." *Bradshaw*, 102 F.3d at 212.

Here, Officer Bradley placed Defendant in the back of his patrol car to give a safe place, away from traffic, for him to wait, while he questioned Newland. Defendant was not handcuffed. At this point in the stop, Officer Cloyd had left the scene to assist with an emergency and Officer Bradley was processing the traffic stop alone. Officer Bradley had not completed the tasks necessary to the traffic stop, such as performing the NCIC check, checking the status of Defendant's driver's license, and writing out the citation. Defendant argues that Officer Bradley had abandoned the traffic stop at this point and was focused on a secondary investigation. However, as discussed above, Officer Bradley was questioning Defendant and his passenger to either confirm or dispel his increasing and reasonable suspicion that they were engaged in criminal activity.

Moreover, once Officer Cloyd returned to the scene, Officer Bradley collected Defendant's driver's license, registration, and proof of insurance from his windshield and returned to his patrol car to perform the records check and write the citation. The K-9 unit arrived before Officer Bradley received the results from the records check. Within two and one-half minutes of receiving the

38

NCIC results and while he was drafting the citation, the drug detection dog alerted on the Defendant's car. Thus, even though Officer Bradley was pursuing his investigation of whether the car contained controlled substances, he continued to process the traffic stop. Thus, Defendant's placement in the patrol car did not improperly prolong the stop.

*(4) Exclusionary Rule*

Finally, the Government argues that even if any part of the traffic stop was improper, suppression of the evidence is not the appropriate remedy in this case. "The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible." *United States v. Dice*, 200 F.3d 978, 983 (6th Cir. 2000). However, the exclusion of evidence is "a judicially created rule ... 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" *United States v. Herring*, 129 S. Ct. 695, 699 (2009) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). The exclusionary rule applies only where "its remedial objectives are thought most efficaciously served," *Arizona v. Evans*, 514 U.S. 1, 11 (1995), and where it "'results in appreciable deterrence.'" *Herring*, 129 S. Ct. at 700 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). "[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs." *Herring*, 129 S. Ct. at 700 (quoting *Illinois v. Krull*, 480 U.S. 340, 352–53 (1987)). In the end, the decision to suppress evidence "turns on the culpability of the police and the potential for exclusion to deter wrongful police conduct." *Id.* at 698.

Here, the Court finds that while Officer Bradley lacked reasonable suspicion to frisk Defendant, the frisk was brief and did not result in the seizure of any evidence. Nor did the evidence seized in the search of the vehicle flow from the frisk. Additionally, the Court finds that the societal cost of suppressing evidence otherwise legally gained through the valid search of the

vehicle would be great.  Accordingly, the Court finds that none of the evidence should be excluded in this case.

**C. *Miranda* Claims**

The Fifth Amendment to the United States Constitution protects a person from being compelled to incriminate himself.  U.S. Const. amend. V.  A suspect in police custody and subject to interrogation, must be given *Miranda* warnings[16] against self-incrimination; otherwise, any incriminating statements elicited in the interrogation cannot be admitted into evidence at trial. *Dickerson v. United States*, 530 U.S. 428, 431 (2000); *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966); *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998); *see also Stansbury v. California*, 511 U.S. 318, 322 (1994) ("Statements elicited in noncompliance with [*Miranda*] may not be admitted for certain purposes in a criminal trial.").  Defendant contends Officer Bradley questioned him at the scene of the traffic stop while he was detained in the patrol car without first advising him of the *Miranda* warnings.  Accordingly, he argues that all statements on the scene, after he entered the patrol car, must be suppressed.

The Court finds Officer Bradley questioned Defendant about the presence of firearms and controlled substances in his vehicle, while Defendant was seated in the officer's patrol car. Defendant was not provided the *Miranda* warnings until after the search of his vehicle and the seizure of drugs and firearms.  Thus, the pertinent question is whether Defendant was subjected to custodial interrogation at the time he made the statements.  *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (stating the obligation to administer *Miranda* warnings arises only if there has been "such a restriction on a person's freedom as to render him 'in custody'").  Custodial

---

[16]     "*Miranda* warnings" refer to the constitutional requirement that suspects who are in police custody be informed of their Fifth and Sixth Amendment rights "prior to interrogation" as recognized by the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966).

interrogation is questioning after the subject is "taken into custody or the restraint on his freedom . . . rise[s] to the level associated with a formal arrest." *Salvo*, 133 F.3d at 948.

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" *Stansbury*, 511 U.S. at 322 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation omitted)). The Sixth Circuit has identified several factors to assist a court in making this inquiry, which include "the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009); *see also United States v. Swanson*, 341 F.3d 524, 529–530 (6th Cir. 2003). The Supreme Court's "decisions [also] make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned," provided such views are "undisclosed." *Stansbury*, 511 U.S. at 323, 324. "An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned," *id.* at 325, but "are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.* (internal quotations omitted).

Taking together the location of the questioning and whether the individual possessed unrestrained freedom of movement, the Court observes that a motorist subject to a traffic stop "is not 'in custody' for the purposes of *Miranda*" because a traffic stop is akin to an investigatory detention. *Berkemer v. McCarty*, 468 U.S. 420, 437–39 (1984); *Howard*, 815 F. App'x at 79 (questioning defendant outside of his vehicle by side of the road, without any physical restraints,

and with a friendly tone was not coercive and did not require *Miranda* warnings). Traffic stops occur in public, which serves to limit the officer's ability to gain statements through unscrupulous means and to "diminish[] the motorist's fear that, if he does not cooperate, he will be subjected to abuse." *Berkemer*, 468 U.S. at 438. Detaining the motorist inside the patrol car, while permitted as a routine part of a traffic stop, increases the custodial nature of the detention above that of a typical traffic stop. *United States v. Munoz Cedillo*, No. 3:21-CR-101-TAV-JEM, 2022 WL 3572071, at *10 (E.D. Tenn. June 3, 2022), *report & recommendation adopted by,* 2022 WL 2955146 (E.D. Tenn. July 26, 2022). However, here, Officer Bradley stood in the open door of the patrol car when questioning Defendant. Although seated inside the patrol car, Defendant was not handcuffed and was permitted to have his water bottle with him. Officer Bradley asked Defendant a few additional questions after he returned to the patrol car to await the K-9 unit and to perform the records check and complete the citation. However, this conversation was initiated by Defendant asking what was happening and if his driver's license checked out and spontaneously remarking that he and Newland had stayed at a girl's house, rather than a hotel, the preceding night.

The Court also examines the length and manner of the questioning. Here, the Court finds both indicate the questioning was not custodial. Officer Bradley's questions to Defendant in the patrol car were brief. Also, the tone of the questioning was cordial and not accusatory. In response to the questions, Defendant denied possession of any firearms or controlled substances. After examining the totality of the circumstances, the Court finds that Officer Bradley's questions to Defendant prior to the search of Defendant's vehicle were not custodial. After the officers searched the Trailblazer and before any further questions were asked, Officer Bradley advised Defendant of the *Miranda* warnings. Accordingly, the Court finds no *Miranda* violations occurred.

42

**D. Consensual Search of Cellphones**

Following Defendant's arrest at the scene of the traffic stop on December 1, 2021, Defendant was taken to the DEA office, where he was advised of the *Miranda* rights a second time. Defendant then executed a rights waiver and gave consent for the search of two cellphones. In his motion, Defendant argues that his consent to search the cellphones was involuntary because it was tainted by the *Miranda* violation that occurred at the scene of the traffic stop and by the Fourth Amendment violations at the scene [Doc. 68 pp. 24–25]. At the March 2, 2023 evidentiary hearing, the Government produced the video recording of Defendant's statements at the DEA office [Exh. 7], along with the rights waiver form [Exh. 4] and a consent form for the search of his cellphones [Exh. 5]. Defendant agreed that the *Miranda* waiver and Consent to Search form he signed at the DEA office clear the previous taint from his unwarned statements at the scene [Doc. 75 p. 116]. Thus, Defendant no longer asserts that his consent was involuntary.

Defendant persists in his request for suppression of the evidence seized from his cellphones as fruit of the Fourth Amendment violation from the unduly prolonged traffic stop. The Court determined in section B(1) above that law enforcement properly detained Defendant through the time that a drug dog alerted on his vehicle because Officer Bradley had reasonable suspicion that Defendant was engaged in drug trafficking. Thus, to the extent that Defendant's cellphones are fruit of the search of his vehicle and of his arrest for the drugs and firearms seized in that search, the Court finds the tree is not poisonous, i.e., the search and Defendant's subsequent arrest both comported with the Fourth Amendment and the cellphones were properly seized incident to Defendant's arrest.

## V. CONCLUSION

For the foregoing reasons, the undersigned hereby **RECOMMENDS** that Defendant's Motion to Suppress [**Doc. 68**] be denied.[17]

Respectfully submitted:

*Debra C. Poplin*

Debra C. Poplin
United States Magistrate Judge

---

[17] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to appeal the District Court's order. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir.), *cert. denied*, 555 U.S. 1080 (2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). "[T]he district court need not provide *de novo* review where objections [to this report and recommendation] are [f]rivolous, conclusive, or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation omitted). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

44