UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,              )
                                       )
                                       )
              Plaintiff,               )
                                       )        No.:    3:21-CR-156-KAC-DCP-2
v.                                     )
                                       )
ORAINE LIVINGSTON CHRISTIE,            )
                                       )
              Defendant.               )

## ORDER ADOPTING REPORT AND RECOMMENDATION AND DENYING MOTION TO SUPPRESS

Before the Court is United States Magistrate Judge Debra C. Poplin's "Report and Recommendation" ("Report"), entered on April 18, 2023 [Doc. 76]. For the reasons set forth below, the Court (1) **SUSTAINS** portions of Defendant Oraine Livingston Christie's factual objections, as set forth below, and **OVERRULES** the remainder of Defendant Christie's objections, [Doc. 77]; (2) **ACCEPTS** the relevant portions of the Report, [Doc. 76]; and (3) **DENIES** Defendant Christie's Motion to Suppress, [Doc. 68].

## I.      Background

This case arises out of the December 1, 2021 traffic stop of a vehicle driven by Defendant Christie. Knoxville Police Department Drug Interdiction Officer Anthony (Dylan) Bradley pulled the vehicle over for following too closely on Interstate 640 [*See* Doc. 75 at 24-26, 30 (Transcript of Suppression Motion Hearing)]. Defendant Shemar Malik Newland was a passenger in the vehicle [*See id.* at 34].

Prior to the traffic stop, as a drug interdiction officer, Officer Bradley received extensive training on a number of "indicators" of potential illegal activity both before and while engaging

with an individual [*Id.* at 6-7]. That training included assessing "driving behaviors, interview techniques, and looking for attention . . . to detail and abnormalities in the interview as well as vehicle concealment" [*Id.*]. Based on his training, Officer Bradley specifically looks for abnormal reactions to police presence, [*id.* at 12], unusual items in plain view or distinct smells in the vehicle, [*id.* at 15], and body language, such as "body positioning, unnecessary sweating, rapid or s[h]allow breathing, self-grooming . . . rubbing their arms and legs while they're talking to you," "[l]ack of eye contact," ability to "see their heartbeat" or "their pulsating carotid artery," and "exaggerated" responses to questions regarding illegal substances, [*id.* at 18, 21].

Officer Bradley initially encountered Defendant Christie driving in a vehicle during the lunchtime rush on Interstate 640 in Knoxville, Tennessee [*See id.* at 8,10]. Interstate 640 "is a big" "drug corridor," especially "during high-traffic times" when "drug traffickers like to travel" [*Id.*]. Officer Bradley and his partner, Officer Cloyd, were seated in their unmarked patrol cars parked in the "cut-throughs on the interstate that are for authorized vehicles only" [*Id.* at 17, 25]. When Defendant Christie drove past Officer Bradley and Officer Cloyd, Defendant Christie attempted to hide behind the B pillar of the vehicle[1] [*Id.*].

Officer Bradley pulled out of the cut-through and followed the vehicle Defendant Christie was driving [*See id.* at 25]. Officer Bradley observed Defendant Christie following too closely to the vehicle in front of him [*Id.* at 26]. Officer Bradley thereafter turned the lights of his unmarked patrol car on, indicating that Defendant Christie should pull over [*Id.*]. Upon seeing Officer Bradley's lights, Defendant Christie stopped his vehicle at the end of the striped gore area between

---

[1] The B pillar is the "vertical roof support structure located between the front and rear doors on a typical vehicle." *See B Pillar*, EDMUNDS, https://www.edmunds.com/glossary/b-pillar.html (last visited July 26, 2023). It generally lines up with the driver's headrest. *See id.*

2

the ongoing traffic lanes of westbound Interstate 640 on the left and the on-ramp from Western Avenue to the right, just before entering vehicles are forced to merge onto Interstate 640 [*See id.* at 27; Doc. 77-2 (Officer Bradley Body Camera Footage)]. Other vehicles were therefore either (1) accelerating onto the interstate or (2) maintaining interstate speeds on both sides of and in very close proximity to Defendant Christie's vehicle [*See* Docs. 75 at 27; 77-2]. Once the vehicle stopped, Officer Bradley noticed that the driver left the turn signal on [Doc. 75 at 29].

Given the heavy traffic during the lunchtime rush on Interstate 640 and attendant risk of injury, Officer Bradley parked his patrol car behind Defendant Christie's vehicle and approached the passenger side of the vehicle, which abutted traffic from the on-ramp [*See id.*; Doc. 77-2]. Officer Cloyd followed and parked behind Officer Bradley's patrol car [*See* Doc. 77-2]. Officer Cloyd exited his vehicle and stood on the passenger side of Officer Bradley's patrol car, watching as Officer Bradley approached the vehicle [*See id.*]. Upon approaching the vehicle, Officer Bradley saw "scent-masking agents, the trees, the scent trees that everybody buys" "in an unusual spot in the vehicle"—on the gear shift [Doc. 75 at 31-32]. The passenger, Defendant Newland, was "self-grooming," "touching his hair and looking in the rearview kind of concerned about the whereabouts of" Officer Cloyd [*Id.* at 18, 33].

Officer Bradley informed Defendant Christie that he was following the vehicle in front of him too closely, but he told Defendant Christie that he would "probably just [receive] a warning" [*See* Doc. 77-2]. Officer Bradley then asked Defendant Christie to produce his license, registration, and proof of insurance [Doc. 75 at 32-33]. He noted that Defendant Christie's driver's license was from Massachusetts, but the vehicle he was driving had Pennsylvania license plates [*Id.*]. And Defendant Christie could not find the registration and proof of insurance, explaining that the vehicle belonged to his cousin [*Id.* at 33]. As Defendant Christie and Defendant Newland

3

searched for the documents, Defendant Newland dialed the purported owner of the vehicle on his cell phone [*See* Doc. 77-2]. Defendant Newland placed the owner on speaker phone, and Defendant Christie asked the owner where the documents were [*See id.*]. After some back and forth between the purported owner, Defendant Christie, and Defendant Newland, Defendant Christie located the relevant documents and handed them to Officer Bradley using his right hand [*Id.*]. Officer Bradley observed, and body camera footage confirms, that Defendant Christie had "trembling hands while holding his paperwork and on the phone" despite having been told that he would likely just receive a warning [*See id.*; Doc. 75 at 35]. Officer Bradley indicated to Officer Cloyd that Defendant Christie was trembling by shaking his own hand in Officer Cloyd's direction [*See* Docs. 77-2; 75 at 35].

After Defendant Christie provided the insurance information and registration, Officer Bradley asked him to exit the vehicle and come back near the patrol car "for further investigation" [Doc. 75 at 35]. Defendant Christie agreed, bringing a water bottle with him [*Id.* at 36]. Once standing between the police cruiser and Defendant Christie's vehicle, Officer Bradley performed a pat down on Defendant Christie to check for any weapons [*See* Doc. 77-2]. Officer Bradley then asked Defendant Christie questions regarding his travel plans and how he knew Defendant Newland [*See* Doc. 75 at 36-40]. During this questioning, Officer Cloyd was called away to respond to a call for backup, leaving Officer Bradley alone with Defendant Christie and Defendant Newland [*See* Doc. 77-2]. As relevant here, Defendant Christie provided the following explanation of his living arrangements and travel plans:

| | |
|---|---|
| **Officer Bradley:** | Where are you guys heading at today? |
| **Defendant Christie:** | Huh? |
| **Officer Bradley:** | Where are you guys going? |
| **Defendant Christie:** | We are heading to Atlanta. |
| **Officer Bradley:** | Atlanta? |

4

| | |
|---|---|
| **Defendant Christie:** | Yeah. |
| **Officer Bradley:** | Well, where are you coming from? |
| **Defendant Christie:** | We spent New Year—uh, Thanksgiving . . . in Pennsylvania. |
| **Officer Bradley:** | So are you from Pennsylvania? |
| **Defendant Christie:** | No. |
| **Officer Bradley:** | Where are you from? |
| **Defendant Christie:** | Originally, I'm from Massachusetts, but me and my wife got into some issues, so I'm still with my family in Atlanta. |
| | . . . |
| | [Radio traffic indicates a call for backup, and Officer Cloyd leaves to respond.] |
| | . . . |
| **Officer Bradley:** | What are you going to Atlanta for? I'm sorry. |
| **Defendant Christie:** | I stay there with my family now. |
| **Officer Bradley:** | In Atlanta? |
| **Defendant Christie:** | With my cousin, yeah. It's him I just called. |
| | . . . |
| | [Officer Bradley reviews registration.] |
| | . . . |
| | Me and my wife, we are not seeing eye to eye. And she's cheating. So I'm . . . with family in Atlanta. |
| **Officer Bradley:** | Gotcha, gotcha. When did you guys leave, uh, Pennsylvania, is that where you w[ere] at? |
| **Defendant Christie:** | Yesterday about 4:00 P.M. |
| **Officer Bradley:** | Yesterday at 4:00 P.M.? Have you all stopped somewhere? |
| **Defendant Christie:** | Yeah, we stopped in Ohio. |
| **Officer Bradley:** | In Ohio? |
| **Defendant Christie:** | We stayed in a hotel. |
| **Officer Bradley:** | Which hotel did you stay at? |
| **Defendant Christie:** | Huh? |
| **Officer Bradley:** | Which hotel? |
| **Defendant Christie:** | Uh, it was a . . . uh . . . [patting pockets] my phone is in the car. . . [laughing]. |
| **Officer Bradley:** | It's all good. |
| **Defendant Christie:** | It's—uh—Hilton. It's a Hilton but I don't know. |
| | . . . |
| **Officer Bradley:** | And you're going down to Atlanta [be]cause you got family down there, is that correct? |
| **Defendant Christie:** | Yes. |
| | . . . |
| **Officer Bradley:** | Do you live in Atlanta now? |
| **Defendant Christie:** | No. I'm just—I'm in between right now. Truth be told, I'm trying to go back to school. . . . I'm trying |

to finish that up and then see where we go from here.
But if it's up to me I would be living in California.

[*Id.*].  Officer Bradley also asked Defendant Christie about the individual who was riding with him

in the vehicle, later determined to be Defendant Newland:

| | |
|---|---|
| **Officer Bradley:** | Who's in the car with you? |
| **Defendant Christie:** | Huh? |
| **Officer Bradley:** | Who's in the car with you? |
| **Defendant Christie:** | He's my friend. |
| **Officer Bradley:** | Friend?  What's his name? |
| | . . . |
| **Defendant Christie:** | His name is Shemar. . . . |
| **Officer Bradley:** | What's Shemar's last name? |
| **Defendant Christie:** | Oh snap, man [laughing]. |
| **Officer Bradley:** | How long y'all been friends? |
| **Defendant Christie:** | Um, for seven months. |
| **Officer Bradley:** | Oh really? |
| **Defendant Christie:** | Yeah, since I came back to Atlanta. |
| **Officer Bradley:** | Oh, so he's from Atlanta? |
| **Defendant Christie:** | No, but he's from—originally Jamaica . . . |
| **Officer Bradley:** | Where are you from originally? |
| **Defendant Christie:** | Originally, Jamaica. |
| | . . . |
| **Officer Bradley:** | Okay.  Does he have family down there [Atlanta] or is he just hanging out with you? |
| **Defendant Christie:** | He's just hanging out with us.  He has family I think in Florida and New York. |

[*Id.*].

Officer Bradley then wanted to speak to Defendant Newland [Doc. 75 at 40-41].  Given

the dangerous location of the traffic stop in between the buzzing interstate and an on-ramp, Officer

Bradley invited Defendant Christie to "sit in the back [of the patrol car] so [Defendant Christie

was] out of the traffic way" because Officer Bradley "[didn't] want one of [them] to get hit by a

car" [Doc. 77-2].  Before making the offer, Officer Bradley told Defendant Christie "you're not in

trouble or nothing like that" and "I'm not going to put handcuffs on you or anything like that" [*Id.*]

Defendant Christie accepted the offer, attempting to open the door to the patrol car himself and

6

voluntarily entering the backseat [*See id.*]. Officer Bradley "roll[ed] down a window so that [Defendant Christie] would [have] some air" [*Id.*]. Once safely in the patrol car, Defendant Christie did not ask to, or express any desire to, exit the patrol car [*Id.*; *see also* Doc. 77-3 (Rear Seat Camera)].

While Defendant Christie voluntarily sat safely in the patrol car, Officer Bradley questioned Defendant Newland, who was still sitting in the passenger seat of the vehicle Defendant Christie had been driving [*See* Doc. 75 at 41]. Officer Bradley asked Defendant Newland questions similar to those he asked Defendant Christie [*See* Doc. 77-2]. But their accounts of how they knew each other differed [*See id.*]. Officer Bradley's body camera recorded the following conversation with Defendant Newland:

| | |
|---|---|
| **Officer Bradley:** | Where are you guys headed? |
| **Defendant Newland:** | We're going back—We're going to Atlanta. |
| **Officer Bradley:** | Back to Atlanta? Where are you coming from? |
| **Defendant Newland:** | I'm coming from Pittsburgh. |
| **Officer Bradley:** | Pennsylvania? |
| **Defendant Newland:** | Yeah. |
| **Officer Bradley:** | Okay. Do you live up there? |
| **Defendant Newland:** | No. |
| **Officer Bradley:** | Where do you live? |
| **Defendant Newland:** | I'm visiting. |
| **Officer Bradley:** | You were visiting Pittsburgh? Okay. |
| **Officer Bradley:** | Who's driving? What's his name? |
| **Defendant Newland:** | Um, Christie. |
| **Officer Bradley:** | What's his name though? |
| **Defendant Newland:** | Real name? Chalice. |
| **Officer Bradley:** | Chalice? |
| **Defendant Newland:** | Christie, yeah. Oraine is his last name. |
| **Officer Bradley:** | How do you know him? |
| **Defendant Newland:** | I know him from Jamaica. |
| | . . . |
| **Officer Bradley:** | What are you going to Atlanta for? . . . You got family down there? |
| **Defendant Newland:** | I have family. |
| **Officer Bradley:** | Okay. Alright. Uh, and you guys said you'd left where? Where were you guys coming from? |

7

| | |
|---|---|
| **Defendant Newland:** | Pittsburgh. |
| **Officer Bradley:** | When did you leave Pittsburgh? |
| **Defendant Newland:** | From . . . yesterday. |
| **Officer Bradley:** | Yesterday?  Where did you— |
| **Defendant Newland:** | We stopped—we stopped up in—uh—Cincinnati, to get some rest. |
| **Officer Bradley:** | Okay.  Are you going to try to make it down all the way today or are you stopping somewhere else? |
| **Defendant Newland:** | I'm trying to make it down today by, actually, 5:00.  [Defendant Newland receives and reads a text message]. |
| **Officer Bradley:** | By 5:00?  Yeah, that's about right.  And how do you know him? |
| **Defendant Newland:** | I know him from Jamaica. |
| **Officer Bradley:** | Okay.  Did you guys meet in Jamaica, or did you meet where? |
| **Defendant Newland:** | No, we meet in Jamaica. |
| **Officer Bradley:** | Y'all met *in* Jamaica? |
| **Defendant Newland:** | Yeah.  We come here and then we just—you know, we [are] friends from Jamaica so we just—yeah.  . . . |
| **Officer Bradley:** | And you said you all got family down there in Atlanta? |
| **Defendant Newland:** | Yeah. |
| **Officer Bradley:** | Does he stay down there with you?   With your family? |
| **Defendant Newland:** | Yeah, he stays with us. |
| **Officer Bradley:** | Does he have family down there, too? |
| **Defendant Newland:** | Yeah, he's got family down there. |

[*Id.*].

After speaking with Defendant Newland, Officer Bradley returned to his patrol car,

opening the door to speak to Defendant Christie again [*See id.*].  Officer Bradley asked Defendant

Christie follow up questions:

| | |
|---|---|
| **Officer Bradley:** | What's your name?  What do you go by? |
| **Defendant Christie:** | Oraine Christie, um, I have two names.  Where I'm from they call me Sincere. . . . |
| **Officer Bradley:** | What do your friends call you? |
| **Defendant Christie:** | My friends call me Chalice. |
| **Officer Bradley:** | Chaz? |
| **Defendant Christie:** | Yeah. |

8

. . .

| | |
|---|---|
| **Officer Bradley:** | Alright, Chaz. Uh, while I've got you here man, is there anything illegal in the vehicle? |
| **Defendant Christie:** | No [shaking head]. |
| **Officer Bradley:** | Nothing at all? |
| **Defendant Christie:** | Not that I know of. |
| **Officer Bradley:** | Not that you know of. Uh, any, like, . . . illegal firearms, guns? |
| **Defendant Christie:** | No. [Shaking head, widening eyes]. |
| **Officer Bradley:** | No firearms? |
| **Defendant Christie:** | No. |
| **Officer Bradley:** | Any illegal narcotics? |
| **Defendant Christie:** | No. [Shaking head]. |
| **Officer Bradley:** | Like, marijuana? |
| **Defendant Christie:** | No. [Shaking head]. |
| **Officer Bradley:** | Methamphetamine? |
| **Defendant Christie:** | I don't smoke, I don't drink, none of that. |
| **Officer Bradley:** | I got you. Heroin? |
| **Defendant Christie:** | No. [Shaking head exaggeratedly]. |
| **Officer Bradley:** | Pills? |
| **Defendant Christie:** | No! [Shaking head exaggeratedly, laughing]. |
| **Officer Bradley:** | Okay. |
| **Officer Bradley:** | Any large amounts of money or anything like that? |
| **Defendant Christie:** | No. |
| **Officer Bradley:** | None at all? |
| **Defendant Christie:** | No. I use my debit card. |

. . .

| | |
|---|---|
| **Officer Bradley:** | Everything ain't adding up about the travel and everything. You and him, okay? What's his name? |
| **Defendant Christie:** | Shemar. |
| **Officer Bradley:** | Shemar. What's his last name? |
| **Defendant Christie:** | I told you I'm not remembering his last name I don't know why. Oh f***. I've even sent things . . . with his last name. . . . F***ing hell. . . . It's not coming to me. I don't know why. But his name is Shemar. But I don't know why it's not coming to me. |
| **Officer Bradley:** | Okay. It's all good man, you are probably nervous or something. |
| **Defendant Christie:** | [Dramatically shrugging and shaking head] I have no reason to be nervous, I don't know why. . . . |
| **Officer Bradley:** | I know, but like your hands were shaking when you were handing me documents and stuff. |
| **Defendant Christie:** | No—uh—I got shot—uh—in July, in August [pointing to left shoulder]. . . . |

9

Case 3:21-cr-00156-KAC-DCP    Document 86    Filed 07/26/23    Page 9 of 23    PageID #: 669

. . .

| | |
|---|---|
| **Officer Bradley:** | Alright, Chaz. Uh, while I've got you here man, is there anything illegal in the vehicle? |
| **Defendant Christie:** | No [shaking head]. |
| **Officer Bradley:** | Nothing at all? |
| **Defendant Christie:** | Not that I know of. |
| **Officer Bradley:** | Not that you know of. Uh, any, like, . . . illegal firearms, guns? |
| **Defendant Christie:** | No. [Shaking head, widening eyes]. |
| **Officer Bradley:** | No firearms? |
| **Defendant Christie:** | No. |
| **Officer Bradley:** | Any illegal narcotics? |
| **Defendant Christie:** | No. [Shaking head]. |
| **Officer Bradley:** | Like, marijuana? |
| **Defendant Christie:** | No. [Shaking head]. |
| **Officer Bradley:** | Methamphetamine? |
| **Defendant Christie:** | I don't smoke, I don't drink, none of that. |
| **Officer Bradley:** | I got you. Heroin? |
| **Defendant Christie:** | No. [Shaking head exaggeratedly]. |
| **Officer Bradley:** | Pills? |
| **Defendant Christie:** | No! [Shaking head exaggeratedly, laughing]. |
| **Officer Bradley:** | Okay. |
| **Officer Bradley:** | Any large amounts of money or anything like that? |
| **Defendant Christie:** | No. |
| **Officer Bradley:** | None at all? |
| **Defendant Christie:** | No. I use my debit card. |

. . .

| | |
|---|---|
| **Officer Bradley:** | Everything ain't adding up about the travel and everything. You and him, okay? What's his name? |
| **Defendant Christie:** | Shemar. |
| **Officer Bradley:** | Shemar. What's his last name? |
| **Defendant Christie:** | I told you I'm not remembering his last name I don't know why. Oh f***. I've even sent things . . . with his last name. . . . F***ing hell. . . . It's not coming to me. I don't know why. But his name is Shemar. But I don't know why it's not coming to me. |
| **Officer Bradley:** | Okay. It's all good man, you are probably nervous or something. |
| **Defendant Christie:** | [Dramatically shrugging and shaking head] I have no reason to be nervous, I don't know why. . . . |
| **Officer Bradley:** | I know, but like your hands were shaking when you were handing me documents and stuff. |
| **Defendant Christie:** | No—uh—I got shot—uh—in July, in August [pointing to left shoulder]. . . . |

9

[*Id.*].  Defendant Christie broke eye contact when questioned and emphatically denied the presence of heroin or pills in the vehicle [Doc. 75 at 43-44, 73-74].  But Defendant Christie failed to directly answer Officer Bradley's question regarding whether there was methamphetamine in the vehicle and his eyes widened when Officer Bradley asked him about the presence of any firearms in the vehicle [*See id.*].  Defendant Christie also attempted to explain his shaking hands by referring to a recent gunshot injury in his left shoulder, but it was his right hand that Officer Bradley previously observed shaking [Docs. 77-2; 75 at 75].  Shortly after Officer Bradley finished questioning Defendant Christie, Officer Cloyd returned [*See* Doc. 75 at 45].

Because Defendants' behavior led Officer Bradley to suspect that there may be illegal narcotics in the vehicle, Officer Bradley called a K-9 unit to respond [*See id.* at 44].  Although Officer Bradley recalled the K-9 alerting to the presence of narcotics on the passenger side of the vehicle, his body camera shows that the K-9 officer alerted at the driver's side door [*Id.* at 51; Doc. 77-2].  Officer Bradley, Officer Cloyd, and the K-9 handler then began to search the vehicle [Doc. 75 at 51].  Officer Bradley quickly found a small packet containing a substance that turned out to be hashish [*Id.* at 54].  Because Officer Bradley was not familiar with the substance, Officer Bradley *Mirandized* Defendant Christie and asked him what the substance was [*Id.*].  Defendant Christie stated that he did not know [*Id.*].  As the officers continued searching, they found seven (7) individually wrapped packages containing a total of nearly seven and a half (7.5) pounds of methamphetamine, a large amount of cash, and six (6) firearms [*Id.* at 51-52].

After discovering the methamphetamine, Officer Bradley placed Defendant Christie under arrest before escorting him to the Drug Enforcement Agency (DEA) office in Knoxville [*Id.* at 54, 88].  At the DEA office, Defendant Christie formally waived his *Miranda* rights and

signed a consent form authorizing DEA agents to search his two (2) cell phones [*See* Docs. 69-2 (Advice of Rights Form); 69-3 (Consent Form)].

On December 15, 2021, the Grand Jury charged Defendant Christie and Defendant Newland with (1) conspiring to distribute and possess with intent to distribute fifty (50) grams or more of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) (Count One); (2) aided and abetted by one another, knowingly possessing firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2 (Count Two); (3) aided and abetted by one another, possessing with intent to distribute fifty (50) grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2 (Count Three); and (4) aided and abetted by one another, knowingly possessing firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2 (Count Four) [*See* Doc. 15].

On January 30, 2023, Defendant Christie filed the instant "Motion to Suppress," [Doc. 68], requesting that the Court "issue a pre-trial order suppressing all evidence seized or otherwise obtained subsequent to the law enforcement stop of the vehicle [Defendant] Christie was driving on December 1, 2021," [*Id.* at 1]. In his Motion, Defendant Christie asserts that (1) the traffic stop violated Defendant Christie's "right to equal protection" under the Fifth and Fourteenth Amendments; (2) the traffic stop violated Defendant Christie's "Fourth Amendment rights because it lacked reasonable suspicion and probable cause, and was prolonged unnecessarily;" (3) Officer Bradley's "interrogation" of Defendant Christie "violated his Fifth Amendment protections as explained in *Miranda v. Arizona*;" and (4) Defendant Christie's "consent to search his phones was involuntary given the earlier violations of his rights" [*Id.* at 2, 16, 23, 24].

11

Judge Poplin held a hearing on the Motion, [*See* Doc. 74], and thereafter issued the Report, [Doc. 76]. In the Report, Judge Poplin recommends that the Court deny Defendant Christie's Motion to Suppress because (1) "application of the exclusionary rule to Defendant's equal protection claim is precluded" under current law, [Doc. 76 at 28]; (2) Officer Bradley had probable cause to stop Defendant Christie's vehicle, [*id.* at 30]; (3) Officer Bradley had reasonable suspicion to continue to investigate beyond the bounds of a typical traffic stop, [*id.* at 33]; (4) Officer Bradley's investigation did not unconstitutionally prolong the traffic stop, [*id.* at 34-35]; (5) while Officer Bradley did not have reasonable suspicion sufficient to justify the frisk of Defendant Christie, the frisk did not result in any undue delay and no evidence was seized as a result, [*id.* at 35-37]; and (6) Defendant Christie's placement in Officer Bradley's patrol car did not constitute an arrest and did not improperly prolong the stop, [*id.* at 38-39].

Defendant Christie timely objected to specific portions of the Report [*See* Doc. 77]. He specifically objected to the Report's legal conclusions that (1) Sixth Circuit precedent foreclosed his equal protection argument for suppression and (2) Officer Bradley had reasonable suspicion to investigate beyond the bounds of a typical traffic stop [*See id.* at 14-23].[2] And Defendant Christie

---

[2] In Defendant's Objections, he "incorporates by reference the arguments made in his initial Motion to Suppress [Doc. 68] and in his Reply [Doc. 60]" [Doc. 77 at 1]. This incorporation by reference, of course, is not sufficient to constitute a specific objection to the entirety of the Report. *See Howard v. Sec. of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) (concluding that even a "general objection to the entirety of the . . . [magistrate judge's] report" would "have the same effects as would a failure to object"). Here, no Party filed specific objections to the Report's findings or recommendations that (1) Officer Bradley had probable cause to stop Defendant's vehicle, [Doc. 76 at 30]; (2) Officer Bradley's initial investigation did not unconstitutionally prolong the traffic stop, [*id.* at 34-35]; (3) while Officer Bradley did not have reasonable suspicion sufficient to justify the frisk of Defendant Christie, the frisk did not result in any undue delay and no evidence was seized as a result, [*id.* at 35-37]; and (4) Defendant Christie's placement in Officer Bradley's patrol car did not constitute an arrest and did not improperly prolong the stop, [*id.* at 38-39].

12

raised several specific factual objections related to events that occurred during the traffic stop [*See id.* at 13-16]. The United States responded to Defendant Christie's objections, asking the Court to overrule the objections, adopt Judge Poplin's Report, and deny Defendant Christie's Motion to Suppress [*See* Doc. 78].

## II. Analysis

### A. Legal Standard

Under 28 U.S.C. § 636(b)(1), "[a] judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). If a timely objection is made under Section 636(b)(1)(C) and that objection is not "frivolous, conclusive[,] or general," *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986), "the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which [the] objection is made," 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim P. 59(b)(3) ("district judge must consider de novo any objection to the magistrate judge's recommendation"). However, the Court need not engage in de novo review of undisputed portions of the Report. *See Mira*, 806 F.2d at 637; *see also* 28 U.S.C. § 636(b)(1)(C).

While the Court must engage in a de novo review of specific objections, if the objections merely restate the arguments asserted in a defendant's earlier motion, which were addressed by the magistrate judge's report and recommendation, the district court may deem those objections waived. *See Howard*, 932 F.2d at 509; *VanDiver v. Martin*, 304 F. Supp. 2d 934, 937 (E.D. Mich. 2004). "A general objection, or one that merely restates the arguments previously presented is not sufficient to alert the court to alleged errors on the part of the magistrate judge. An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or

13

simply summarizes what has been presented before, is not an 'objection' as that term is used in this context." *VanDiver*, 304 F. Supp. 2d at 937.

Finally, "[w]hen reviewing a magistrate judge's credibility determinations on a motion to suppress, the district court may accept or reject the magistrate judge's determinations, while recognizing a magistrate judge is in the better position to assess the credibility of witnesses [s]he sees and hears." *United States v. Johnson*, No. 10-20176, 2011 WL 3844194, at *2 (W.D. Tenn. Aug. 30, 2011); *see also Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002). A magistrate judge's assessment of witness testimony is entitled to deference unless it appears the findings are clearly erroneous or irreconcilably inconsistent with the established record. *See United States v. Raddatz*, 447 U.S. 667, 684 (1980); *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003); *see also United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999).

### B. Suppression Of Evidence Is Not An Appropriate Remedy For An Alleged Equal Protection Violation.

Defendant Christie filed a general objection to the Report's (1) conclusion that "the law in the Sixth Circuit," as set forth in *United States v. Nichols*,[3] "is that suppression of evidence is not an appropriate remedy for an alleged Equal Protection violation," [Doc. 76 at 27], and (2) recommendation that the Court deny Defendant's motion to suppress to the extent that it is based on an alleged violation of the Equal Protection Clause, [*id.* at 29]. Defendant Christie "continues to assert [that] *United States v. Nichols*" "does not restrict his pursuit of this argument" or, "[a]lternatively, it [*Nichols*] is ripe for reexamination by the Sixth Circuit" [Doc. 77 at 23]. This argument is unavailing.

---

[3] 512 F.3d 789, 794 (6th Cir. 2008), *overruled on other grounds as recognized in United States v. Buford*, 632 F.3d 264 (6th Cir. 2011).

14

In *Nichols*, the Sixth Circuit noted that it is "aware of no court that has ever applied the exclusionary rule for a violation of the Fourteenth Amendment's Equal Protection Clause." *Nichols*, 512 F.3d at 794. Against this backdrop, the Court concluded that "the proper remedy for any alleged violation [of the Equal Protection Clause] is a 42 U.S.C. § 1983 action against the offending officers." *See id.* More recently, the Sixth Circuit confirmed that "*United States v. Nichols* controls" and "precludes application of the exclusionary rule to . . . [an] equal protection claim." *See United States v. Cousin*, 448 F. App'x 593, 594 (6th Cir. 2012) (citations omitted). The Court also confirmed that a Section 1983 action against the offending officer is "the proper remedy" for a violation of the Equal Protection Clause. *See id.* (citations and quotations omitted). Under *Nichols* and its progeny, even if an officer violated Defendant Christie's rights under the Equal Protection Clause with respect to the traffic stop at issue in this case, a Section 1983 action against the officer, not suppression of evidence, is the proper remedy. *See Nichols*, 512 F.3d at 794; *Cousin*, 448 F. App'x at 594. Accordingly, the Court **OVERRULES** Defendant Christie's objection, [Doc. 77 at 23], and **ACCEPTS** the relevant portion of the Report, [*see* Doc. 76 at 29].

### C. Officer Bradley Had Reasonable Suspicion Of Criminal Activity Sufficient To Lawfully Extend The Traffic Stop.

Defendant Christie filed specific objections seeking de novo review of the Report's factual findings, application of law, and ultimate recommendation regarding whether Officer Bradley had reasonable suspicion sufficient to expand the scope of the traffic stop [*See* Doc. 77 at 13-22]. *First*, Defendant Christie objects to the Report's characterization of certain facts, including that (1) Defendant Christie "responded that he was originally from Massachusetts, lived in Pennsylvania, but now lives in Atlanta with his parents," [Doc. 76 at 11-12]; (2) the substance found in the vehicle that Officer Bradley initially asked Defendant Christie about was "a leafy

15

green substance," [*id.* at 25]; and (3) the K-9 officer alerted on the passenger side—not the driver's side—of the vehicle, [*id.* at 14]. ***Second***, Defendant Christie avers that "the factual findings of the Report" "omit important facts from the evidence at the suppression hearing" and "give unquestioning credence to assertions by Officer Bradley" [Doc. 77 at 14]. Defendant Christie faults the Report for (1) "credit[ing] Officer Bradley's ability to see Mr. Christie 'hiding behind the vehicle's B pillar'" without noting his failure to make other observations; (2) "not[ing] the extraneous information offered by Mr. Christie" "without also noting the extraneous conversations Officer Bradley was having with him;" (3) "not acknowledg[ing] the traffic noise audible in the videos" or "Officer Bradley's difficulty hearing answers" when considering Defendant Christie's repeated response of "huh?;" (4) describing Defendant Christie as "finally respond[ing]" to Officer Bradley's inquiry as to Defendant Newland's name, "imply[ing] delay or uncertainty;" and (5) "not acknowledg[ing] that Mr. Christie's and Mr. Newland's descriptions of their travel were consistent" [*Id.* at 15]. ***Finally***, Defendant Christie "objects to the legal conclusion" "that the government established that Officer Bradley had a 'reasonable and articulable suspicion of criminal activity' that would support extending . . . the traffic stop" [*Id.* at 16 (quoting Doc. 76 at 31)].

### 1. Factual Objections

After reviewing the record, including the video exhibits of the traffic stop that were not available to the Magistrate Judge while drafting her Report, the Court agrees with Defendant that certain factual inaccuracies exist in the Report [*See id.* at 13]. ***First***, based on the record before the Court, it is unclear where Defendant Christie lived at the time of his arrest [*See* Docs. 75 at 38, 40; 76 at 11-12]. It does not appear that Defendant Christie stated that he lived in Pennsylvania. Rather on December 1, 2021, he stated that he "spent New Year—uh, Thanksgiving . . . in

16

Pennsylvania" [*See* Doc. 77-2]. **Second**, Defendant Christie is correct that Officer Bradley did not characterize the substance initially located in the Christie vehicle as "a leafy green substance" [Doc. 76 at 25]. Accordingly, the Court will not characterize it as such. For clarity, Officer Bradley described the substance as follows:

> So while we were searching, I found the substance that looked, I was very unfamiliar with [it] at the time. Turned out I think it was hashish which is like an herb that people can smoke. . . . I asked him [Defendant Christie] what the substance was just [be]cause I was unfamiliar with it.

[Doc. 75 at 54]. **Finally**, Defendant Christie is correct that the K-9 officer alerted on the driver's side of the vehicle Defendant Christie was driving, not the passenger side [*See* Doc. 76 at 14]. The Court thus sustains Defendant Christie's factual objections and corrects these factual inaccuracies for the record.

### 2. *Credibility Determination And Contextual Objection*

Next, the Court overrules Defendant Christie's objections regarding the Report's credibility determination as to Officer Bradley's ability to view Defendant Christie hiding behind the B pillar of the vehicle and contextual assessment of certain testimony. Credibility determinations are most properly made by the magistrate judge who has the opportunity to see and hear a witness's testimony. *See Moss*, 286 F.3d at 868; *Johnson*, 2011 WL 3844194, at *2. Judge Poplin's assessment of Officer Bradley's testimony regarding the B pillar is entitled to deference, and Defendant Christie has not provided any sufficient basis for the Court to question that credibility determination. *See Irorere*, 69 F. App'x at 236; *see also Navarro-Camacho*, 186 F.3d at 705. Further, given the passage of time, the undersigned's review of the relevant testimony shows that Officer Bradley's testimony was largely consistent with the video recordings capturing his interactions with Defendant Christie nearly two years ago. And the factual context that

17

Defendant Christie criticizes the Report for omitting—such as Officer Bradley's "extraneous conversations" with Defendant Christie or ambient "traffic noise"—is both captured on the record and insufficient to call into question Judge Poplin's assessment of Officer Bradley's credibility or otherwise change the outcome of this case. Further, the record regarding Defendant Christie and Defendant Newland's stated travel plans, which were also captured on video, speaks for itself. Accordingly, the Court **OVERRULES** Defendant Christie's objection to the Report's credibility determination regarding Officer Bradley and **OVERRULES** Defendant Christie's objection that the Report omits key facts and context. As discussed below, the Court reviews the full factual record anew with respect to Defendant Christie's legal objection regarding whether Officer Bradley had reasonable suspicion to extend the traffic stop.

### 3. Legal Objection

Defendant Christie does not challenge the Report's conclusion that Officer Bradley had probable cause to initially stop the vehicle Defendant Christie was driving [*See* Doc. 77]. But even "a seizure that is lawful at its inception can still violate the Fourth Amendment if its manner of execution unreasonably infringes [upon] interests protected by the Constitution." *United States v. Nobles*, 762 F.3d 509, 519-20 (6th Cir. 2014) (cleaned up) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). And "[t]he extension of a stop beyond its original purpose . . . is a new Fourth Amendment event." *United States v. Johnson*, 482 F. App'x 137, 143 (6th Cir. 2012); *see also Terry v. Ohio*, 392 U.S. 1, 27 (1968). Generally, a "dog sniff may render an otherwise lawful seizure unlawful only if it unreasonably prolongs the initial stop and the officer lacked an independent reasonable suspicion to extend the stop." *United States v. Stepp*, 680 F.3d 651, 663 (6th Cir. 2012) (citing *Caballes*, 543 U.S. at 409; *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009)). "If an officer develops reasonable and articulable suspicion" that criminal activity is afoot

18

"during a stop, 'he may extend [the] traffic stop long enough to confirm or dispel his suspicions.'" *United States v. Winters*, 782 F.3d 289, 296 (6th Cir. 2015); *see also United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (emphasis added).

Reasonable suspicion is a relatively low standard. *See Untied States v. McCallister*, 39 F.4th 368, 373-74 (6th Cir. 2022) (describing reasonable suspicion as "a moderate chance of finding evidence of wrongdoing" (citations and quotations omitted)). It only "requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001) (citing *Terry*, 392 U.S. at 21). It requires more than a "hunch." *United States v. Garrido*, 467 F.3d 971, 982 (6th Cir. 2006) (quoting *United States v. Sokolow*, 490 U.S. 1 (1989)). But officers are permitted "to judge [an individual's] behavior and the information obtained" during the course of the lawful "stop against the backdrop of their own experience and knowledge," *id.* at 983 (citing *Hill*, 195 F.3d at 270), and "to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person,'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 499 U.S. 411, 418 (1981)).

To determine "whether the combination of factors considered by the officer [was] sufficient for reasonable suspicion," courts look to the "totality of the circumstances." *See United States v. Townsend*, 305 F. 3d 537, 542 (6th Cir. 2002) (emphasis omitted). "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *See Arvizu*, 534 U.S. at 277-78 (citation omitted). Rather, "[i]n considering all of the circumstances, the question is . . . whether all of [the factors] taken together give rise to the reasonable suspicion that criminal activity may be afoot." *United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005) (citing

19

*Arvizu*, 534 U.S. at 274-75). While "some factors are more probative than others," a court must find that, under the totality of the circumstances, the factors "sufficed to form a particularized and objective basis" for the officer to permissibly extend the stop under the Fourth Amendment. *Arvizu*, 534 U.S. at 277-278. This is a fact-based determination. *See e.g., United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (collecting cases and identifying factors).

Here, the Report notes that "approximately eighteen minutes elapsed from the time that Officer Bradley collected Defendant's driver's license, registration, and proof of insurance and the alert by the drug dog" occurred [Doc. 76 at 31]. And the Report identified a number of "red flags" that, "considered in the aggregate, constituted articulable facts providing a reasonable suspicion for Officer Bradley to continue to investigate" beyond the bounds of a typical traffic stop [*Id.* at 32-35]. Accordingly, the Report concluded that "the ten-minute period during which Officer Bradley questioned Defendant [Christie] and Newland about their travel itinerary and how long they knew each other did not unconstitutionally prolong the traffic stop" because Officer Bradley had "***reasonable suspicion*** that criminal activity was afoot" [*Id.* at 33-34 (emphasis added)].

Defendant Christie objects to the legal conclusion that Officer Bradley had "reasonable and articulable suspicion of criminal activity" [Doc. 77 at 16]. He specifically raises a number of objections, addressing each red flag that Officer Bradley relied on to form reasonable suspicion and providing a purportedly innocent explanation for the red flag [*See id.* at 19-22]. However, the Supreme Court has expressly stated that "[t]he totality-of-the-circumstances test 'precludes this sort of divide-and-conquer analysis'" and reminded lower courts that they cannot simply "dismiss outright any circumstances that [are] 'susceptible of innocent explanation.'" *See District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (quoting *Arvizu*, 534 U.S. at 274, 277); *see also*

20

*United States v. Campbell*, 511 F. App'x 424, 428 (6th Cir. 2013) (noting "the Court has counseled against a divide-and-conquer analysis" (citation omitted)). Defendant Christie also provides citations to a number of other cases where circumstances distinguishable from the instant case were insufficient to establish reasonable suspicion. But "[t]he Supreme Court has recognized that . . . [a] 'determination'" in one case "'will seldom be a useful precedent for another'" given the fact-dependent nature of the reasonable suspicion inquiry. *See Townsend*, 305 F.3d at 542 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 n.11 (1983)).

Upon de novo review of the record, the Court agrees with the Report that Officer Bradley had reasonable suspicion that criminal activity was afoot sufficient to legally extend the stop. Officer Bradley testified to his extensive training on a number of "indicators" of potential illegal activity [Doc. 75 at 6-7, 12, 15, 18, 21]. And a number of these indicators were present from the beginning of this interaction. ***First***, Officer Bradley encountered Defendant Christie on Interstate 640—a known "drug corridor"—"during [a] high-traffic time[]" when "drug traffickers like to travel" [*Id.* at 8, 10]. ***Second***, Officer Bradley credibly testified that he observed Defendant Christie "tuck behind the B pillar" of the vehicle when he saw Officer Bradley's unmarked patrol car in the "cut-through[]" on Interstate 640, suggesting an attempt to hide his face from officers [*Id.* at 17, 25]. ***Third***, upon approaching the vehicle, Officer Bradley saw "scent-masking agents," which Officer Bradley knew to be a common method of masking the smell of narcotics, "in an unusual spot in the vehicle" [*Id.* at 31-32].

Further conversations with and observations of Defendants Christie and Newland heightened Officer Bradley's suspicion. Defendant Christie was driving in Tennessee using a driver's license from Massachusetts. And he was driving a vehicle with Pennsylvania license plates [*Id.* at 32-33]. This further aroused Officer Bradley's suspicions because, through his

21

training, he knew that drug traffickers frequently use third-party vehicles to traffic drugs [*Id.* at 20, 34]. *See also Stepp*, 680 F.3d at 666 (recognizing that drug couriers "may commonly drive other people's . . . cars"). And Officer Bradley credibly testified, and body camera footage confirmed, that he observed Defendant Christie's "trembling hands while holding his paperwork and on the phone" [Doc. 75 at 35]. Defendant Christie's hands trembled even after Officer Bradley told Defendant Christie he would likely just receive a warning, suggesting that there may be more than a potential traffic violation at issue [*Id.*]. Defendant Newland, the passenger in the vehicle, was "looking in the rearview [mirror] kind of concerned about the whereabouts of" the second officer on the scene, which Officer Bradley's training suggests is an indicator of potential illegal activity [*Id.* at 18, 33]. Notably, Officer Bradley made these observations even before Defendant Christie exited the vehicle. Considering the totality of the circumstances, these combined factors establish reasonable suspicion that criminal activity was afoot. "Although each series of acts was 'perhaps innocent in itself,' . . . taken together, they 'warranted further investigation.'" *Arvizu*, 534 U.S. at 274 (quoting *Terry*, 392 U.S. at 22).

Officer Bradley's suspicion only grew as he questioned Defendant Christie outside of the vehicle. Defendant Christie told Officer Bradley that the purported owner of the vehicle Christie was driving with Pennsylvania plates was Defendant Christie's cousin in Atlanta, Georgia [*See* Doc. 77-2]. The information Defendant Christie provided regarding how, and how well, he knew Defendant Newland did not add up [Doc. 75 at 36]. And Defendant Christie struggled to provide details of his and Defendant Newland's shared travel [*Id.*]. When asked about the contents of the vehicle, Defendant Christie failed to maintain eye contact, suggesting a falsehood; failed to directly answer Officer Bradley's question regarding methamphetamine in the vehicle; and his eyes widened when Officer Bradley asked him about the presence of firearms in the vehicle [*Id.*

at 43-44, 73-74]. Officer Bradley testified that, based on his training and experience, these reactions "could indicate that [illegal contraband is] present in the vehicle" [*Id.* at 43]. *See also Stepp*, 680 F.3d at 666 (finding a "noticeable change" in the occupant's behavior when asked "relatively basic follow-up questions" by the officer contributed to the officer's reasonable suspicion). Looking at the totality of the circumstances, Officer Bradley had reasonable suspicion that Defendant Christie was engaged in criminal activity. Accordingly, the Court **OVERRULES** Defendant Christie's objection, [Doc. 77], and **ADOPTS** the relevant portion of the Report, [Doc. 76], regarding the scope of the traffic stop.

### III. Conclusion

As set forth above, the Court **SUSTAINS** portions of Defendant Christie's factual objections and **OVERRULES** the remainder of Defendant Christie's "Objections to Report and Recommendation Regarding Defendant's Motion to Suppress," [Doc. 77]; **ACCEPTS** the remaining portions of the "Report and Recommendation," [Doc. 76]; and **DENIES** Defendant Christie's "Motion to Suppress," [Doc. 68].

IT IS SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge